UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

_____ )
In re FEDEX GROUND PACKAGE               )   CAUSE NO. 3:05-MD-527 RM
SYSTEM, INC. EMPLOYMENT                   )        (MDL-1700)
PRACTICES LITIGATION                      )
---------------------------------------------- )
THIS DOCUMENT RELATES TO:                 )
                                          )
*Alexander, et al. v. FedEx Ground*       )
*Packages Systems, Inc.*, Cause No.       )
3:05-CV-528 RM                            )
_____ )

OPINION AND ORDER

This case, originally filed in the Northern District of California as that court's Cause No. 3:05-CV-38, is one of several centralized before this court pursuant to the order of the Judicial Panel on Multi-District Litigation creating MDL-1700. The common issue in the cases in the MDL docket is whether FedEx Ground drivers are employees or independent contractors. The reader's familiarity with the general arguments in this docket is presumed.

The plaintiffs in this case assert class claims for nationwide relief under the Family Medical Leave Act and for statewide relief under California law. The plaintiffs amended their complaint this week to add a claim for retaliation in violation of the Family Medical Leave Act. 29 U.S.C. § 2615. Unsurprisingly, no motion to certify a retaliation class has been filed. The matter came before this court for hearing on October 9, 2007 on the plaintiffs' motions for temporary restraining order and preliminary injunction. This opinion is intended to satisfy

the requirements of Federal Rule of Civil Procedure 52. For the reasons that follow, the court denies the plaintiffs' motions.


I

On August 13, 2007, the California Court of Appeal delivered at least a partial defeat to FedEx Ground's contention that its drivers are independent contractors rather than employees. Estrada v. FedEx Ground Package Systems, Inc., 154 Cal. App. 4th 1 (2007). The Estrada decision affirmed a finding that FedEx Ground's SWA (single work area) contract drivers were employees. On September 20, 2007, FedEx Ground announced to its nationwide workforce of pickup and delivery drivers that, starting October 26, 2007, it is moving to an all-MWA (multi-work area) business model in California and will not renew the contracts of the 1,000 or so California SWA contractors. Under this "California Transition" program, no SWA contractors will remain in California by June 2008. The drivers watched a videotaped message from CEO Dave Reholz and received a pamphlet during mandatory meetings at their terminals. FedEx Ground's "California Transition" program applies equally to all California SWA contractors, without regard to whether they have been a party to any litigation.

FedEx Ground drivers operate under written contracts that set terms of one, two, or three years. Each contract contains a provision that automatically renews the contract on a year-to-year basis unless FedEx Ground or the driver prevents renewal. Historically, FedEx Ground has allowed drivers' contracts to renew

2

automatically unless cause exists for mid-term termination of the contract. FedEx Ground didn't terminate any existing contracts; under the "California Transition" program, the contracts simply will not be renewed pursuant to the automatic renewal provision.

Also on September 20, FedEx Ground announced the availability of what it calls voluntary transition incentives for California SWA contractors. The incentives provide financial and other assistance to any SWA contractor wishing to become an MWA contractor, or to help SWA contractors who wish to leave the business and pursue other opportunities. The incentives range from $25,000 to just over $81,000, depending on the SWA contractor's annual revenues from the route. A California SWA contractor must sign a Contractor Conversion and Release Agreement to receive such payments. Section 3(a) of the Contractor Conversion and Release Agreement limits the release to claims related to the September 20 non-renewal announcement:

> Contractor . . . releases and discharge[s] . . . any and all claims . . . arising out of or in any way connected with (i) [FedEx Ground]'s announcement(s) that it is modifying its relationship with contractors in California, and (ii) any and all actions related to [FedEx Ground]'s modification of its relationship with California contractors, including, without limitation, any contemplated or actual termination, non-renewal or assignment of [Contractor's] Operating Agreement, and any contemplated or actual sale, assignment, or other disposition of a primary service area . . . .

Section 3(b) of the release agreement, which addresses Section 1542 of the California Civil Code, is limited to the claims defined in paragraph 3(a), which are claims related to the "California Transition." The materials FedEx Ground provided

urges the drivers to contact their attorneys and includes the name and methods for contacting the putative class's counsel.

SWA contractors have until October 26, 2007 to accept or reject these offers. FedEx Ground explains that it is acting now, with this speed, because it wants to lay any uncertainty to rest before getting deeply into its peak season runs from just before Halloween through the end of the year.

FedEx Ground is free to reject any SWA contractor's efforts to become an MWA contractor. Any California SWA contractor, in turn, is free to reject the incentives and choose instead to continue operating under the existing terms of his or her Operating Agreement, though that contractor's contract will not be renewed at expiration. The materials FedEx Ground distributed to contractors explain that

> No contractor is required to sign the release of claims documents. Whatever a contractor chooses, nothing in today's announcement affects any current contract with FedEx Ground, which remains in effect. . . . In exchange for the transition incentives, FedEx Ground is asking California SWAs for a release of certain potential claims related to this transition. The release is not intended to settle all claims you may have against FedEx Ground, and is limited to potential claims concerning FedEx Ground's announcement of this transition incentive; the termination, non-renewal or assignment of the Contractor's Operating Agreement; and any sale assignment, loss or other disposition of the Contractor's primary service area.

In the "Question and Answer" section purporting to explain the decision, FedEx Ground explains:

> **Are you making these changes in light of the recent decision in the Estrada case?** We are making these changes in light of the overall regulatory and legal environment in California. While the

4

Estrada case is part of that environment, it is still in the appeals process, and applies to the treatment of some expenses for certain contractors in California between 1996 and 2004.

California is the only state with so significant a decision finding FedEx Ground drivers to be employees. In all other states, FedEx Ground has told its SWA contractors that it doesn't anticipate eliminating their SWA positions "at this time." At least 75% of FedEx Ground's 12,000 pickup and delivery drivers are SWA contractors. Most of the drivers know FedEx Ground's business model was challenged in California and is being challenged on a nationwide basis in this multi-district litigation docket. Which claims will be certified for class adjudication, and whether the SWA contractors and MWA contractors will be found to be employees, are questions pending before this court.

The plaintiffs say FedEx Ground's decision to terminate the California SWA contractors was meant to, and does, send a chilling message to the plaintiffs and putative class members in this MDL docket about the consequences they may face if they participate in the litigation to bring it to a successful conclusion. The plaintiffs contend this "California Transition" is a mass firing of all California SWA contractors that sends a message to all FedEx Ground drivers that their participation in, or cooperation with, this or similar lawsuits may result in unemployment. As a result, the plaintiffs say, their ability to proceed with this suit will be compromised.

The "California Transition" doesn't change the control FedEx Ground exercises over its California MWA contractors. For example, no changes are made

as to how the drivers must perform or what colors they must display. FedEx Ground coupled its announcement of the mass California terminations with the offer of an unprecedented raise for the MWA workforce, called "Enhanced Primary Plus" (EPP). According to FedEx Ground, EPP is geared towards making the MWA "opportunity" more attractive with the ultimate goal of "strengthen[ing] the independent contractor model." To this end, FedEx Ground promises to pay extra annual compensation to its MWA contractors of between $5,000 and $26,000, depending on how many routes a contractor takes on.

The EPP program is mandatory for any California SWA contractor hired back as an MWA contractor. FedEx Ground promises a first EPP payment this year. EPP participants must execute an indemnification agreement; Section 2.2(f) of the Addendum requires a contractor to:

> Indemnify FedEx Ground for, and hold FedEx Ground harmless from, any liability and claims by Contractor or any third party, including, but not limited to, any persons utilized by Contractor or governmental entities, arising from Contractor's use or employment of any other person(s) in the performance of Contractor's obligations, including, but not limited to, claims or liabilities arising under industrial accident prevention, workers' compensation, or similar laws or any federal, state or municipal laws applicable to the relationship between and among employers and employees.

FedEx Ground is offering "voluntary transition incentives" of $25,000 to $81,000 to those willing to execute a release of claims. FedEx Ground distributed to each California SWA contractor a release for each driver to sign. To collect the money, the SWA contractors must execute the releases and return them to FedEx Ground no later than October 26, 2007.

The plaintiffs assert that the release's language gives rise to the powerful inference that FedEx Ground intends to leave the door wide to claim—if it so chooses—that the SWA contractors who sign have waived their right to participate as class members in this MDL action. They say the release doesn't precisely state what claims it does, and does not, encompass. As the plaintiffs read it, Section 3(a) suggests that the scope of the release may be limited in some fashion to claims "related" to aspects of the "California Transition," while Section 3(b) suggests that it is intended to be a general release of all possible claims the signatory driver possesses against FedEx Ground. There is no express exclusion of the claims that have been asserted in the instant MDL actions or the earlier Estrada case. The plaintiffs also contend that the releases are being obtained through coercion: the threat of termination.

Mr. Rebholz's video message didn't mention the release. FedEx Ground indicated in the written materials that the release is limited to potential claims "concerning" various aspects of the "California Transition." In a section entitled "*Important Legal Note,*" in the "Question and Answer" section, FedEx Ground says:

> **"Will the release affect my ability to participate in the pending lawsuits?"** The release is not intended to settle all claims you may have against FedEx Ground, but is limited to potential claims related to this transition. That said, FedEx Ground cannot advise you on your individual circumstances. Please read all documents carefully, and consult your own legal counsel.

The "Entire Agreement" clause in Section 11 states that "any representation, promise or agreement not specifically included in this agreement shall be binding

7

upon or enforceable against either party." The plaintiffs maintain that FedEx Ground's insistence that the drivers sign this document as a condition for being paid what is essentially severance for many years of service, on very short notice, is coercive.

FedEx Ground told the California SWA contractors that they have the option to be rehired by FedEx Ground as MWA contractors. FedEx Ground has always reserved the right to approve, or deny, the application of any driver to add additional routes to his or her contract. FedEx Ground hasn't guaranteed any of the California SWA contractors that they will be approved for additional routes if they wish to be rehired in a MWA contractor status. Driver declarants have previously sought and been denied permission from FedEx Ground to "grow their business" by adding another route, or know others who were denied permission.

FedEx Ground offers incumbent MWA contractors payments of $15,000 for each route now operated by any California SWA contractor they can get between now and May 31, 2008; the plaintiffs see this has essentially putting all of the California routes up for sale. Thus, California SWA contractors will compete with incumbent MWA contractors, as well as with each other, to acquire routes so they can qualify as MWA contractors.

FedEx Ground requires any California SWA contractor who is allowed to acquire an additional route to participate in the EPP program and sign a new contract addendum called a "Compliance Disclosure." Mr. Rebholz's videotaped statement says that the purpose of the Compliance Disclosure Addendum is to

"validate compliance with applicable laws." The twelve-page pamphlet says the same thing: "While the operating agreement has always required contractors to comply with all applicable laws and regulations, a new compliance-disclosure addendum will be required of MWAs that elect to participate in the EPP program. In this addendum, MWAs will agree to specific processes to validate compliance with applicable laws."

FedEx Ground didn't hand out the Compliance Disclosure Addendum along with the other documents distributed on September 20 when it announced the EPP. The Compliance Disclosure Addendum requires MWA contractors to treat the others they hire to assist on their routes (e.g., as drivers or helpers) as employees for all legal purposes and to provide FedEx Ground with documentary proof that they have done so. It requires MWA contractors to indemnify FedEx Ground for claims for liability or claims brought at any time against FedEx Ground by the MWA contractor him/herself arising under federal or state employment laws, as well as claims that others might bring against FedEx Ground.

FedEx Ground also has offered the EPP program to its MWA contractors nationwide. To be paid the EPP compensation, all MWA contractors must sign the Compliance Disclosure Addendum and waive their legal claims against FedEx Ground. When the new fiscal year begins on June 1, 2008, all MWA contractors will be required to sign the Compliance Disclosure Addendum as a condition of continued employment with FedEx Ground.

Until then, existing MWA contractors in California and elsewhere are not required to accept the EPP payments or sign the Compliance Disclosure Addendum and may continue to work without penalty under their existing contracts. The materials distributed to contractors emphasize that "Enhanced Primary Plus is a voluntary program for existing Multiple Work Area contractors, not an automatic one." New MWA contractors in California entering into new contracts with FedEx Ground must sign the Compliance Disclosure Addendum.


## II

> To win a preliminary injunction, a party must show that it is reasonably likely to succeed on the merits, it is suffering irreparable harm that outweighs any harm the nonmoving party will suffer if the injunction is granted, there is no adequate remedy at law, and an injunction would not harm the public interest. If the moving party meets this threshold burden, the district court weighs the factors against one another in a sliding scale analysis, which is to say the district court must exercise its discretion to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied.

Christian Legal Society v. Walker, 453 F.3d 853, 859 (7th Cir. 2006) (citations omitted). To satisfy the requirement of a reasonable likelihood of success on the merits, a movant need show only a better than negligible possibility of success, Washington v. Indiana High Sch. Athletic Ass'n, 181 F.3d 840, 846 (7th Cir. 1999), and the degree of likelihood of success is reflected in the balancing of harms. Chicago Dist. Council of Carpenters Pension Fund v. K & I Constr., Inc., 270 F.3d 1060, 1064 (7th Cir. 2001).

A.

The court's discussion begins with the assumption that the plaintiffs bring their request for a preliminary injunction under Federal Rule of Civil Procedure 23(d). Although the plaintiffs didn't cite Rule 23(d) as the basis for the relief they seek, that rule authorizes courts to regulate communications with putative class members about the litigation. *See* Gulf Oil Co. v. Bernard, 452 U.S. 89, 100 (1981) ("Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. But this discretion is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules."); Williams v. Chartwell Fin. Servs., Ltd., 204 F.3d 748, 759 (7th Cir. 2000) ("[T]he district court was clearly concerned about the potential for abuse if the plaintiffs were allowed to contact Chartwell's customers, and expressed concern over the effect of such contacts on Chartwell's business. This is a legitimate concern, and certainly presents a potential justification for the district court's limitations on discovery. Nevertheless, a district court's discretion in this area is not unlimited. The plaintiffs have a right to contact members of the putative class, and any discovery limitations should be carefully drawn. The district court's decision as to the protective order must involve a careful balancing of the potential for abuse created by the class action and the right of the plaintiffs to contact potential class members." (citations omitted)). Courts may limit a defendant's communications with putative class members under Rule 23(d) upon a "clear

11

record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." Gulf Oil Co., 425 U.S. at 101. Otherwise, a defendant's contact with putative class members generally cannot be limited. *See* Wiginton v. Ellis, No. 02 C 6832, 2003 WL 22232907, at *3 (N.D. Ill. Sept. 16, 2003) (plaintiffs' assertions found to be "too speculative" to justify restrictions on communications); Jenifer v. Delaware Solid Waste Auth., Nos. Civ.A. 98-270 & 98-565, 1999 WL 117762, at *4 (D. Del. Feb. 25, 1999) ("[A]n ongoing business relationship, such as the relationship here between DSWA and the waste haulers, can increase the possibility that the communications between litigants are coercive. Where there is a relationship that is inherently coercive, the court does not need to make a finding that a particular abuse has occurred. The court, however, must still require a clear record of threatened abuses. There must be some evidence that justifies an interference with DSWA's speech." (citations omitted)).

General Motors announced the cessation of the Oldsmobile line during the pre-class certification period in Ralph Oldsmobile, Inc. v. General Motors Corp., No. 99 Civ. 4567, 2001 WL 1035132 (S.D.N.Y. Sept. 7, 2001). General Motors offered transition payments to its Oldsmobile dealerships (several of which would be in the putative class), but conditioned those payments on the dealerships' execution of releases that included the claims that gave rise to the class action. General Motors' communications with the dealerships about the release made no reference to the class litigation. The court found potential coercion in the

12

relationship between General Motors and the dealerships—new Oldsmobiles were not available from other sources—and "a potential for unknowing waivers resulting from a lack of information." *Id.* at *4.

The potential for coercion is similar here. Just as Oldsmobile dealerships could try to arrange to sell Toyotas, but could only get new Oldsmobiles from General Motors, the California SWA contractors might be able to become drivers for another delivery service, but can remain with FedEx Ground only by doing what FedEx Ground requires of them. But potential for coercion such as this inheres in any employment-type relationship and in a wide range of business relationships, so it cannot, standing alone, warrant the types of restriction on speech to which Gulf Oil raised the tent flaps. Adding the ingredient of payments of EPPs to contractors who might worry about the financial consequences to them of FedEx Ground's action does not add a cognizable flavor of coercion. *See* Fabert Motors, Inc. v. Ford Motor Co., 355 F.2d 888, 891 (7th Cir. 1966) ("Economic coercion is not established by showing that the release was given under pressure of financial circumstances under threat of Ford's having recourse to an action Ford was legally entitled to take.").

Unlike the releases General Motors demanded of the Oldsmobile dealerships, FedEx Ground's releases did not, until the amended complaint was filed earlier this week, affect the claims at issue in this case, and the releases clearly directed the drivers to class counsel for information about this case. As set forth above, Section 3(a) of the Contractor Conversion and Release Agreement (and

13

so, by virtue of its language, Section 3(b)) is limited to claims relating to the "California Transition" program announced last month. The new Addendum required as part of the EPP provides that an MWA contractor must validate his or her compliance with applicable laws and regulations by providing documentation to the company. The indemnification provision is limited to claims arising from the contractors' relationships with their employees and contains no release of claims that the contractors themselves might have against FedEx Ground. The contractors already had committed to that degree of indemnification obligation in Section 3.5(d) of the current Operating Agreement:

> 3.5 Contractor's Responsibility for Certain Losses. The following indemnities constitute an exception to the provision for risk protection to the Contractor provided in subparagraph 3.2. During the term of this Agreement and thereafter, Contractor agrees to indemnify and save FHD harmless against liabilities as follows:
>
> (d)    Any or all claims brought against FHD or liabilities incurred by FHD arising from the Contractor's relationship with Contractor's employees, whether under industrial accident prevention laws, or any other federal state or municipal laws, rules, regulations and orders applicable to the relationship between employers and employees.

The plaintiffs say employee expenses are among the categories of damages they seek in this case, and the indemnification provision in the Addendum would waive any such claim by requiring the plaintiffs to repay FedEx Ground for any such expenses FedEx Ground might be required to pay the plaintiffs. The court doesn't read the Addendum as expanding any such obligation already in the current Operating Agreement.

The release appears as though it would extinguish the FMLA retaliation claims in the newly-filed amended complaint because those claims are related to the "California Transition." The Gulf Oil Court, though, discouraged limits on anything other than misleading or abusive communication. The release's omission of reference to FMLA retaliation claims can't be called misleading: if those claims exist at all, they did not exist until FedEx Ground announced the package of which the release was a part, and the claims were not filed until the day of the preliminary injunction hearing.

Of course, a communication may be abusive without being misleading, and the plaintiffs contend the existence and communication of the "California Transition" program is abusive. They contend that it conveys—and was intended to convey—the message to drivers that they can be cast aside if they oppose FedEx Ground. The plaintiffs haven't persuaded the court that FedEx Ground's communications to putative class members are abusive in the sense the Gulf Oil Court meant. Both sides agree that FedEx Ground was responding to a court decision holding that FedEx Ground's business model was not what FedEx Ground said it was and that would require FedEx Ground to pay millions of dollars to drivers for what had occurred in the past.

It stretches the language to describe as "abusive" an attempt to stop doing that for which one has just been ordered to pay damages. The plaintiffs take the position that the new model is no different than the old except the California drivers will have multiple, rather than single, work areas. The drivers, say the

15

plaintiffs, still are employees rather than independent contractors. And perhaps the plaintiffs are right. But FedEx Ground has some reason to think, from the record in the Estrada litigation, that the law views MWA contractors differently than SWA contractors. If FedEx Ground is wrong on that point, the company might be required to pay post-"California Transition" damages—but no such damages will be required if FedEx Ground is right on that point.

The court doesn't doubt the plaintiffs' affiants' assertions that the "California Transition" has a chilling effect in that it makes drivers fear participation in this case. But a change in a business model seems likely to follow from an appellate's court telling a company that its previous business model is such as to require the payment of millions of dollars in damages. Few changes in business models are cost-free to everyone involved, and suits challenging business models often produce such changes. In effect, the plaintiffs' motion for a preliminary injunction asks that the court to make FedEx Ground continue the business model for which it is being sued and for which the plaintiffs seek damages. That is not the sort of order the Gulf Oil Court contemplated.

Federal Rule of Civil Procedure 23(d) does not justify the preliminary injunction sought here.

## B.

Federal Rule of Civil Procedure 65 generally covers issuance of preliminary injunctions. FedEx Ground argues that the court has no authority to award

preliminary injunctive relief to benefit the uncertified putative class, as distinct from the named plaintiffs, under Rule 65. The argument appears to be a strong one. The putative class members aren't parties to the action at this point in the proceedings. A court generally cannot base injunctive relief under Federal Rule of Civil Procedure 65 on threatened harm to non-party putative class members:

> Because a class has not been certified, the only interests at stake are those of the named plaintiffs. Some own properties that may be affected in the future by the Fast Track program, but their interests can be protected by an injunction that prevents the City from demolishing their properties. That is the point of [*Los Angeles v. Lyons*, 461 U.S. 95 (1983)]: A wrong done to the plaintiff in the past does not authorize prospective, class-wide relief unless a class has been certified. Why else bother with class actions?

McKenzie v. City of Chicago, 118 F.3d 552, 555 (7th Cir. 1997) (citation omitted). Four of the named plaintiffs are California SWA contractors who might have standing to seek preliminary injunctive relief in their own behalf, but they haven't asked for such relief and the parties haven't addressed that issue.

The plaintiffs' citations are not inconsistent with the law as FedEx Ground explains it. In Moore v. Summers, 113 F. Supp. 2d 5, 29 (D.D.C. 2000), which the plaintiffs' reply brief describes as "finding preliminary injunction barring retaliatory conduct pre-class certification warranted based on chilling effect such conduct would have on rights of putative class members," the district court actually denied injunctive relief despite finding that some post-filing actions taken by the defendant Secret Service were likely to deter potential class members from coming forward with their claims. Recinos-Recinos v. Express Forestry, Inc., No.

17

Civ.A. 05-1355, 2006 WL 197030 (E.D. La. Jan. 24, 2006), in which the court issued a protective order under Rule 23, involved actual communications with putative class members, albeit accompanied by physical threats and bribes by alleged agents of the defendants, who defended against the protective order solely on the basis of the evidence and not any claim of impermissibility of an injunction on non-constitutional grounds. <u>Mevorah v. Wells Fargo Home Mortgage, Inc.</u>, No. C 05-1175, 2005 WL 4813532 (N.D. Cal. Nov. 17, 2005), involved a Rule 23 motion to correct alleged misrepresentations by the defendant.

Nonetheless, too little case law specifically addresses the propriety of relief in the circumstances presented here for the court to hold comfortably that the requested injunction relief lies beyond the court's power under Rule 65. Because the preliminary injunction is inappropriate on several other grounds, the court assumes, without deciding, that Rule 65 would allow preliminary injunctive relief for the benefit of non-party putative class members were things as the plaintiffs see them.

1.

The first thing a plaintiff must show in seeking a preliminary injunction under Rule 65 is a likelihood of success on the merits. <u>Eco Mfg. LLC v. Honeywell Int'l, Inc.</u>, 357 F.3d 649 (7th Cir. 2003) (preliminary injunction properly denied when plaintiff showed no likelihood of success). The plaintiffs have not shown a better than negligible chance of success on the merits of their retaliation claim.

Later developments in the case might, of course, result in a plaintiffs' victory, but the court must evaluate the existent record when considering a preliminary injunction.

FedEx Ground argues that the plaintiffs have no likelihood of success because nothing in the record indicates that they are employees of FedEx Ground, as distinct from independent contractors who would have no FMLA rights vis-a-vis FedEx Ground. The court cannot agree. This case is part of an ML docket in which several filings applicable to all constituent actions disclose areas in which FedEx Ground controls its drivers' performance of their tasks. Whether that control is such as to make the drivers "employees" under federal or any state law remains to be decided, but the plaintiffs have come forth with enough to show that they might win. Further, while the Estrada decision is not yet final and so does not yet (if it ever will) amount to collateral estoppel, its existence demonstrates that FedEx Ground recently exercised enough control over its drivers to amount to an employer over some employees under someone's law.

While the plaintiffs have at least some chance of proving they are employees rather than independent contractors, the rest of their FMLA retaliation claim is strung together too loosely to support a finding of likelihood of success at this juncture. To prevail on a retaliation claim under the FMLA, the plaintiffs will need to prove that FedEx Ground is terminating their SWA contracts because they engaged in activity protected by the FMLA. Burnett v. LFW, Inc., 472 F.3d 471, 481-482 (7th Cir. 2006). No causal connection between the FedEx Ground

19

"California Transition" and any protected activity by the plaintiffs seems even remotely apparent.

The filing of the Estrada case would not appear to be protected activity under the FMLA. The court recognizes that there may have been issues in Estrada that were not appealed and of which this court is unaware, but the appellate decision in Estrada makes no mention of any federal employment laws; it reports that the drivers were found to be employees within the meaning of Section 2802 of the California Labor Code. 154 Cal. App. 4th at 10. *See also* Kodl v. Board of Educ. Sch. Dist. 45, 490 F.3d 558, 563 (7th Cir. 2007) (complaints of general harassment not protected activity under federal employment discrimination laws). Further, the temporal disconnect between the filing of Estrada in 1999 and the 2007 "California Transition" announcement is far too great to support—and indeed, tends to negate—any inference of retaliatory intent in 2007. *See, e.g.,* Scaife v. Cook County, 446 F.3d 735, 742 (7th Cir. 2006) ("But rather than create an inference of causation, the timing of Scaife's suspensions weighs against him."). Further, since FedEx Ground is treating all California SWA contractors identically so far, it appears unlikely that the plaintiffs can establish a retaliation claim via the indirect method by showing that other employees were treated more favorably. *See* Hull v. Stoughton Trailers, LLC, 445 F.3d 949 (7th Cir. 2006) (prima facie case of retaliation not made out without proof that plaintiff was treated less favorably than similarly situated employees who did not engage in protected FMLA activity).

The drivers' victory in the <u>Estrada</u> suit seems to be the event for which the plaintiffs say FedEx Ground is retaliating, and FedEx Ground agrees that the appellate decision in <u>Estrada</u> was a (perhaps the primary) motivating factor in the "California Transition." The court is aware of no authority for the proposition that winning a lawsuit is a separate protected activity from filing the suit, so the same timing problem may plague this theory. More importantly, though, winning a lawsuit under a provision of the California Labor Code would not seem to be activity protected by the federal Family Medical Leave Act and so would not support a retaliation claim under the federal act.

The court simply is unable to imagine what protected activity is said to have been undertaken by putative class members that were not part of the class in <u>Estrada</u>. The Family Medical Leave Act supports one of the claims in this suit, but the plaintiffs filed this suit in 2005, again too long ago to support, and perhaps so long ago as to defeat, an inference of retaliatory motive.

For all these reasons, the court concludes that plaintiffs have shown no likelihood of success on the merits of their FMLA retaliation claim. In the same spirit in which the court handled the issue of its authority to issue the requested injunction, though, the court concedes the possibility that the plaintiffs have shown a better than negligible chance of success (though not at all a strong one) and proceeds with the balance of the analysis.

2.

The plaintiffs have not demonstrated a threat of irreparable injury. An injury is not irreparable if there is an adequate remedy at law, and there is an adequate remedy at law if the injury can be compensated by money damages. If the plaintiffs or putative class members are losing their jobs for an illegal reason, those losses are compensable by an award of damages. East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co., 414 F.3d 700 (7th Cir. 2005); Bedrossian v. Northwestern Memorial Hosp., 409 F.3d 840 (7th Cir. 2005). If the plaintiffs or punitive class members are being required to sign illegal waivers and/or indemnity clauses, it is difficult to articulate any harm, irreparable or otherwise, from signing an unenforceable waiver.

The plaintiffs' affidavits from drivers who worry for their livelihoods if they step forward raise concern; loss of class members and eager witnesses cannot easily be quantified in dollars. But while the plaintiffs have cited cases that establish a court's authority to enjoin a defendant from picking off potential members by bribe, thuggery, or misdirection, Recinos-Recinos v. Express Forestry, Inc., No. Civ.A. 05-1355, 2006 WL 197030 (E.D. La. Jan. 24, 2006); Mevorah v. Wells Fargo Home Mortgage, Inc., No. C 05-1175, 2005 WL 4813532 (N.D. Cal. Nov. 17, 2005), none of the cases suggest an independent right to have fellow class members or enthusiastic witnesses that can be protected from otherwise lawful business conduct.

3.

To the extent the plaintiffs might be said to have established that they will suffer some irreparable harm without the requested injunctive relief, they have not established that such a risk of harm outweighs the risk of irreparable harm to FedEx Ground if the injunction issues and is later found to have been issued in error.

> The court appraises the risk of irreparable harm to the parties not simply by reference to what they will lose by an unfavorable ruling today, but rather by reference to the harm of error: what irreparable harm would denial of a preliminary injunction cause to [the movant] and the public if the trial reveals that [the movant] is entitled to relief; and what irreparable harm will the granting of an injunction do to [the opponent] and the public if the trial reveals that [the movant] is not entitled to relief? Once those evaluations are made, the court balances likelihood of success and the risk of irreparable harm on a sliding scale: the better a party's chances of winning at trial, the less the balance of harms needs to favor that party.

AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 831 (7th Cir. 2002).

The Estrada appellate decision indicates that continuation of the pre-"California Transition" model might subject FedEx Ground to damages awards. Such awards would themselves be compensable by damages, but could outgrow the plaintiffs' ability to pay them; certainly this record affords the court no basis on which to determine the amount of the bond the plaintiffs would be required to post as a condition of preliminary injunctive relief. *See* Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000) ("When setting the amount of security, district courts should err on the high side. . . . Unfortunately, an error

in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond.").

Further, uncertainty as to the status and future of SWA contractors would menace FedEx Ground's ability to maintain a stable work force in its heaviest business season, threatening incalculable damages to FedEx Ground's till, good will, and future business.

The balance of the harms greatly favors FedEx Ground and disfavors issuance of the requested injunction.


III

For all of these reasons, the court DENIES the plaintiffs' motion for temporary restraining order and preliminary injunction [docket # 878].

SO ORDERED.

ENTERED:    October 12, 2007


    /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court