UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

_____

| | |
|---|---|
| In re FEDEX GROUND PACKAGE ) | Cause No. 3:05-MD-527 RM |
| SYSTEM, INC., EMPLOYMENT ) | (MDL-1700) |
| PRACTICES LITIGATION ) | |

-------------------------------------------------- )

THIS DOCUMENT RELATES TO:                    )
                                                                        )
ALL ACTIONS                                                   )
                                                                        )
_____ )

OPINION AND ORDER

This multi-district action involving the classification of FedEx Ground
pickup and delivery drivers is before the court on the Kansas plaintiffs' motion for
class certification, as well as the certification of the national ERISA class. As a
preliminary matter, though, all plaintiffs have moved to strike portions of expert
reports the defendants use in support of their opposition to class certification. For
the reasons that follow, the court overrules the plaintiffs' motions to strike, grants
the Kansas and ERISA plaintiffs' motions for class certification, and denies
defendant's request for oral argument on plaintiffs' motions for class certification

I

The Judicial Panel on Multi-District Litigation created this docket and
assigned it to the undersigned judge in 2005. The docket now includes fifty-six
cases. Briefing is complete on most of the class certification motions, and the
putative class representatives have moved to strike, under Federal Rule of

Evidence 702, various expert opinions the defendants have offered as part of their certification submissions. The court heard argument on the motions to strike on August 20, 2007. Because argument on the class certification motions would be both unwieldy and unnecessary, the court declines to hear argument on those motions.

The over-arching issue in this docket is the classification of certain FedEx Ground pickup and delivery drivers as independent contractors rather than employees. The named plaintiffs have moved to certify thirty state class action complaints and a national ERISA class. Most of the putative state class actions seek some combination of monetary damages, rescission of the operating agreement, as well as declaratory and injunctive relief under the state wage statutes. The proposed class-definition for nearly all the state class actions is some version of the following:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since xx/xx/xxxx, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of the terminal state of xxxxxxxxx.

The ERISA national class claim seeks both declaratory relief regarding the putative class members' participant status and entitlement to benefits under FedEx Ground's ERISA plans, as well as payment of benefits to which they are entitled, but were improperly denied as a result of their misclassification.

The named plaintiffs seek to maintain class claims under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

The named plaintiffs seek exclusion of opinions of Dr. Deborah Jay, Robert Crandall, and Dr. Richard Jeanneret. Their reports generally seek to show, through various data, that the named plaintiffs haven't had the common experience necessary to warrant class certification. The named plaintiffs challenge the reports' admissibility on several grounds relating to relevance and the reliability of the methods used in gathering and analyzing the data.

Federal Rule of Evidence 702 seeks to assure that "experts' work is admissible only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data." Lang v. Kohl's Food Stores, Inc., 217 F.3d 919, 924 (7th Cir. 2000). The rule substantially codifies Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), which made trial judges gatekeepers who ensure that testimony is relevant and protect courtrooms from scientific opinions not based on reliable principles and methods. Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002) The first prong of this framework evaluates the reliability of the testimony; the second prong evaluates the testimony's relevance—whether the testimony assists the trier of fact with its analysis of any of the issues involved in the case. Ammons v. Aramark Uniform Servs., Inc., 368 F.3d 809, 816 (7th Cir. 2004). The proponent of expert testimony bears the burden of proving its compliance with Rule 702. Daubert v. Merrell Dow, 509 U.S. at 592 n.10.  A judge deciding whether evidence

is reliable "must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." Zelinski v. Columbia 300, Inc., 335 F.3d 633, 640 (7th Cir. 2003).

The reliability inquiry focuses on the expert's methodology, while the soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment. Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000) (*citing* Daubert v. Merrell Dow, 509 U.S. at 595); *see also* Walker v. Soo Line R.R. Co., 208 F.3d 581, 587 (7th Cir. 2000) (when addressing whether expert testimony is reliable the district court should not consider the "factual underpinnings" of the testimony but should determine whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed"). The Daubert Court and the Advisory Committee notes to amended Rule 702 provide a series of guideposts gatekeeping courts are to use: (1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error when applied; (4) whether the theory has been generally accepted in the scientific community of which it is a part; (5) whether maintenance standards and controls exist; (6) whether the testimony addresses matters growing from research conducted independent of litigation; (7) whether the witness unjustifiably extrapolates from accepted premise to unfounded conclusion; (8) whether the

4

expert accounts adequately for obvious alternative explanations; (9) whether the expert uses as much care as she would use in professional work outside of paid litigation consulting; and (10) whether the expert's claimed field of expertise is known to reach reliable results for the type of opinion the expert would give. Fuesting v. Zimmer, 421 F.3d 528, 534-535 (7th Cir. 2005), *vacated in part* 448 F.3d 936 (7th Cir. 2006). The Rule 702 test is a flexible one, and no single factor is either required in the analysis or dispositive as to its outcome. Smith v. Ford Motor Co., 215 F.3d at 719.

> The trial court must use the criteria relevant to a particular kind of expertise in a specific case to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field'.

Id. (*quoting* Kumho Tire v. Carmichael, 526 U.S. at 152).

When analyzing the relevance of proposed testimony, the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case. Smith v. Ford Motor Co., 215 F.3d at 719. The expert may satisfy this requirement without opining on the ultimate question to be resolved by the trier of fact. Walker v. Soo Line R.R. Co., 208 F.3d at 587. The relevance consideration has been described as one of "fit" that requires "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Daubert v. Merrell Dow, 509 U.S. at 591-592. In other words, "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." Id. at 591.

An expert may be qualified by "knowledge, skill, experience, training, or education." FED. R. EVID. 702. While "extensive academic and practical expertise" in an area may suffice to qualify a potential witness as an expert, Bryant v. City of Chicago, 200 F.3d 1092, 1098 (7th Cir. 2000), "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." Walker v. Soo Line R.R. Co., 208 F.3d at 591; *see also* Kumho Tire v. Carmichael, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Thus, a court should consider a proposed expert's full range of practical experience, as well as academic or technical training, when determining whether that expert is qualified to render an opinion in a given area. Smith v. Ford Motor Co., 215 F.3d at 718.

The parties dispute the Daubert rule's applicability to class determinations. The defendants cite to Turner v. Murphy Oil USA, Inc., No. Civ. A. 05-4206, 2006 WL 91364 (E.D. La. Jan. 12, 2006), in which the court took a quick glance approach to the Daubert analysis only to ensure that "it contains no flaws that would render it inadmissible as a matter of law," id. at *4, leaving until trial the full Rule 702 analysis. *See also* Dukes v. Wal-Mart, Inc., 474 F.3d 1214, 1227 (9th Cir. 2007) ("courts need not apply the full *Daubert* 'gate-keeper' standard at the class certification stage. Rather, 'a lower *Daubert* standard should be employed at this [class certification] stage of the proceedings.'" (*citing* Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc., 209 F.R.D. 159, 162

6

(C.D. Cal. 2002)); In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 134-135 (2d Cir. 2001) (in the class certification phase, the "[d]istrict Court must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law."). The plaintiffs cite West v. Prudential Securities, Inc., 282 F.3d 935, 938 (7th Cir. 2002), for the proposition that a "district judge may not duck hard questions by observing that each side has some support, or that considerations relevant to class certification also may affect the decision on the merits. Tough questions must be faced and decided ."

None of those cases squarely reflect the posture of today's case. Those cases all involved evidence that would be used at trial, but which also affected the propriety of class certification. In contrast, the expert opinions challenged here all deal solely with the class certification question; there is no later inquiry to which a Rule 702 analysis might be deferred.

On the other hand, the Rule 702 analysis is a gatekeeping tool, designed to keep unreliable scientific opinion from juries. There is little reason to think a judge can dispassionately scrutinize an expert's opinion for reliability under Rule 702, only to be injudiciously affected by the same opinion. For that reason, "[t]he 'gatekeeper' doctrine . . . is largely irrelevant in the context of a bench trial." Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 852 (6th Cir. 2004). A court evaluating expert opinion addressed solely to the factors the court must evaluate under Federal Rule of Civil Procedure 23 is, for all practical purposes, conducting a bench trial and serving as a trier of fact.

Accordingly, the court approaches the plaintiffs' objections to the defendant's experts under a substantially relaxed Rule 702 analysis. The court will not struggle to discern the often-faint line between the opinion that is unpersuasive because it is not based on reliable principles reliably applied and the opinion that is unpersuasive despite being based on reliable principles reliably applied.

A

Commissioned by FedEx in mid-2006, Dr. Jay's report relies on a survey of FedEx Ground drivers conducted under her leadership. Thirty-six interviewers contacted 3,059 drivers in thirty-one different states by telephone. The interviewer read from a script indicating that FedEx Ground requested the survey. Respondents were asked eleven questions, including whether they considered themselves independent contractors or employees and which designation they preferred. Based on the survey findings, Dr. Jay prepared a report stating that FedEx Ground workers prefer to be independent contractors by a 52% to 20% margin. FedEx Ground relies on the report in support of its opposition to class certification, claiming the report shows a disconnect between the remedies sought by putative class members.

The plaintiffs say the Jay Report fails both the reliability and relevance prongs of the Daubert test because the survey does not conform to generally

accepted principles of survey research and the report is irrelevant to the issue of class certification.

Survey evidence is independently admissible at trial where there is a substantial showing of reliability. Baumholser v. Amax Coal Co., 630 F.2d 550, 552 (7th Cir. 1980). Reliability of opinion survey evidence is based on whether (1) the survey was "conducted in accordance with generally accepted survey principles," and (2) "the results [were] used in a statistically correct manner." Id. The survey's facts and data needn't be independently admissible at trial for an expert to testify as to an opinion based on the otherwise inadmissible survey, so long as the methodology is of a type reasonably relied upon by experts in the field to form opinions or inferences. Id.; FED. R. EVID. 703. Dr. Jay's report does more than simply state her conclusions based on data that someone else collected; the report actually conveys results of her study.

In determining whether the survey was conducted in accordance with "accepted survey principles," most courts look to the Federal Judicial Center's *Reference Manual on Scientific Evidence*, which provides several factors courts should consider in assessing the reliability of a survey: (1) the survey's purpose and design, (2) population definition and sampling —"was the appropriate universe defined"—, (3) the survey questions and structure —"were the questions framed to be clear, precise, and unbiased"—, and (4) the interviewers — "where the interviewers appropriately selected and trained."

9

First, the plaintiffs say Dr. Jay's method and procedures engineered a biased survey because the survey wasn't conducted in a "double blind" fashion in which both the respondents and the interviewers are unaware of the purpose of the survey or its sponsor. Novartis Consumer Health. Inc. v. Johnson & Johnson-Merck Consumer, 290 F.3d 578, 590 (3rd Cir. 2002). In response, FedEx Ground says the survey was conducted in a double blind manner because the respondents didn't know the purpose and disclosing the sponsor to them was necessary because unlike a consumer survey (where random calls are expected), the interviewer needed to explain how they knew the respondent was employed with FedEx Ground. The Judicial Center's Manual suggests that disclosing the sponsor to the respondents isn't fatal to the reliability of a survey and, in fact, might be required in some cases. In those cases, courts should consider (1) whether the sponsor has views and expectations that are apparent and (2) whether the respondents are aware of those views.

Interviewers had to disclose that FedEx Ground was the sponsor. Dr. Jay testified that cooperation depended on disclosing how the interviewer obtained the respondents' names. The plaintiffs say "the interviewees would be reluctant to express a view on this matter that is opposite the view held by FedEx," but disclosing FedEx Ground as the sponsor doesn't make the survey biased because the respondents wouldn't necessarily associate a view with FedEx Ground. Interviewees who knew of this litigation reasonably might presume the interview was for this suit, especially if, as the plaintiffs allege, FedEx Ground has engaged

in an information campaign aimed at controlling what the drivers know of the MDL proceedings. Still, Dr. Jay testified that in workforce surveys, respondents aren't influenced by external factors and typically provide answers based on their own experiences.

Second, the plaintiffs say Dr. Jay did not properly choose and define the relevant population because the surveyed population was under-inclusive. The parties disagree as to the implications of an under-inclusive sample. FedEx says the alleged under-inclusiveness of the survey would affect only the weight accorded the survey, not its admissibility, while the plaintiffs say under-inclusive surveys should be excluded. The cases cited by the parties suggest that "[t]echnical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not on the survey's admissibility," and "survey evidence should only be excluded "when the sample is clearly not representative of the universe it is intended to reflect." Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1544 (10th Cir. 1996); see also Spraying Systems Co. v. Delavan, Inc., 975 F.2d 387, 394 n. 5 (7th Cir. 1992) ("Since a sizable portion of the parties' products are sold to distributors and equipment manufacturers, the selection of farmers only as the relevant universe limits the surveys' probative value even further." (emphasis added)).

The plaintiffs first take issue with the size of the survey sample: (1) the starting population (9,000 potential respondents) was only 46 percent of the total number of drivers (20,000), (2) responses from 3,000 drivers constitutes only 15

11

percent of the total number of drivers, (3) former drivers weren't included, and (4) the survey included drivers from only thirty-one states, while the nationwide ERISA class includes potential drivers from all fifty states.

FedEx Ground says the target population for the survey was every driver in the thirty-one states in which a class action was pending at the time of the survey, and the absence of former drivers is irrelevant because the survey data will be used to show a conflict between the declaratory relief sought by the named plaintiffs and the proposed class members. FedEx Ground's position is the more persuasive. Dr. Jay testified that the survey's purpose was to determine whether current drivers would now prefer to perform their duties as independent contractors. In that respect, whether former drivers prefer classification as an employee goes only to monetary damages, not to declaratory relief. As Dr. Jay points out, nothing suggests the results would differ had the survey called drivers in the other nineteen states. Drivers in the thirty-one states that had class actions pending might be more likely to have been aware of the litigation, but that again goes to the weight of the evidence.

The plaintiffs' expert says Dr. Jay's sample has a disproportionate amount of multiple work area contractors, opposed to single work area contractors. Dr. Jay's supplemental report suggests the statistical breakdown is very close to reflecting the actual make-up of the contractors. Dr. Jay explains in her supplemental report that the percentile differences may be the result of a disconnect between the way FedEx Ground classifies its contractors and the way

the contractors classify themselves. Whatever difference might exist is not sufficient to render the survey unreliable.

Finally, the plaintiffs question the response rate, but Dr. Jay's response indicates the response rate was about 75 percent, which she says is a high cooperation rate. The plaintiffs' reply doesn't contest this conclusion.

The plaintiffs also take issue with the survey's questions and structure, which, they say, created a bias because the language primed respondents to lean towards answers indicating an independent contractor relationship. Specifically, the callers referred to the respondents as "contractors" eight times during the script. Dr. Jay explains that this terminology was chosen because FedEx Ground referred to the drivers as contractors, but that doesn't seem to affect whether people associate the term "contractor" with specific employment characteristics, one of which might be owning your own business. The plaintiffs say the bias created by the terminology is further exasperated by the failure to define the terms "employee" and "contractor." This seems to be the crux of the problem with this survey—the survey ultimately calls for lay persons to state preferences and understandings about a relationship that the law defines. The impact of the choice of terminology depends on the purpose for which FedEx Ground seeks to use Dr. Jay's results.

FedEx Ground says the survey is being introduced to show that "there is a conflict between the proposed class representatives and the putative class members about the form of the forward-looking declaratory and injunctive relief

13

that would potentially be sought if plaintiffs were to prevail on the threshold liability issues." Fifty-two percent of the current contractors who responded to the Field Survey would prefer to be independent contractors and 20 percent would prefer to be employees. As the plaintiffs point out, though, the answer to question—"Would you prefer to perform your pick-up and delivery services as an employee or an independent contractor?"—is meaningless because the question doesn't inquire into the respondents' preferences as to the remedy they would receive for being wrongfully classified. This survey is unpersuasive when offered to prove that the proposed class members don't want declaratory relief sought by the named plaintiffs.

B

The plaintiffs challenge the portion of Mr. Crandall's report that analyzed whether FedEx Ground routes meet the attributes of businesses such that it can be said that contractors are operating businesses. Mr. Crandall reviewed data relating to four different criteria attributable to businesses: (1) the requirement for capital investment; (2) the opportunity to expand; (3) the opportunity to generate profits and losses through the hiring of others; and (4) the opportunity to generate profit, loss, and changes in equity value through managerial decisions. To analyze the fourth criterion, Mr. Crandall conducted a phone survey of FedEx Ground drivers regarding the market for FedEx Ground delivery. He found that there is a significant market for FedEx Ground delivery routes, so drivers could make

14

decisions affecting their gross income. Based on these findings, Mr. Crandall concluded that FedEx Ground delivery drivers are operating a business.

The plaintiffs seek to exclude Mr. Crandall's report because he isn't qualified as an expert in research, economics, or statistics, and his survey lacks a reliable methodology, and his analysis of the data is unreliable.

The plaintiffs say Mr. Crandall is not an expert in survey design and administration or in economics. They say Mr. Crandall lacks requisite education in survey design and business valuation, isn't published in either of those fields, and his experience relating to economics is mainly in the field of damages. FedEx Ground says Mr. Crandall's education and experience are sufficient to allow him to testify as an expert.

Mr. Crandall is a partner in the litigation consulting practice of Resolution Economics, LLC. Before consulting, Mr. Crandall performed related work for fourteen years for Deloitte & Touche, Altschuler, Melvoin and Glasser, and Price Waterhouse. He holds a Masters of Business Administration Degree from Loyola Marymount University. Mr. Crandall's main area of expertise is economic damages, but he has experience in his consulting practice and during trial preparation related to economics, business valuations, and class action employment matters.

Mr. Crandall has no courses, seminars, or publications in the relevant fields of research, economics, or statistics and hasn't taken any course dedicated exclusively to "business valuation." He has, though, taken courses in substantive

areas relevant to valuing a business, including economics, accounting, statistics, mergers and acquisitions, enterpreneurism, finance, and strategic planning. This course work alone may not carry the day, but experts can qualify to testify based upon personal experience. *See* <u>Smith v. Ford Motor Co.</u>, 215 F.3d at 718 (*citing* <u>Walker v. Soo Line R.R. Co.</u>, 208 F.3d at 591) ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience."). Mr. Crandall has participated in fifteen to twenty surveys and has provided business valuation and testimony in other cases. That his experience has been predominately with FedEx, and that he has only provided trial testimony five other times, doesn't mean he isn't qualified to provide an opinion on the differing value of the drivers' "businesses." Mr. Crandall's background is in economics and includes several years of consulting on economic and employment matters, including survey design, research, and business valuations. The expertise that Mr. Crandall has developed as a result of these experiences puts him in a position to offer responsible opinion testimony on the subjects covered in his report.

The plaintiffs say Mr. Crandall's survey didn't comport to the Judicial Center's generally accepted survey principles. First, they say the sample of only 146 drivers out of the nearly 5,000 current and former drivers who had bought or sold routes between 2000 and 2006 (2,900 of whom's telephone numbers are available), results in a 5 percent response rate, which is too small to yield any conclusions. Mr. Crandall admits the sample is small. FedEx Ground says the sample was sufficient because the survey's purpose wasn't to review the sales

transactions in detail to determine route valuation, but rather "to examine the basic questions of (1) whether there is a market for routes and (2) are routes changing hands for consideration." The plaintiffs also say the survey wasn't reliable because some respondents didn't remember the transaction's details, a problem commonly referred to as "memory decay." The plaintiffs note that some respondents couldn't remember the price for which they bought or sold their routes; others received their routes for free. The survey results, however, take those responses into account with a category for respondents who couldn't recall the details of the purchase or had received the route for free. The plaintiffs also say the questions were confusing, but they don't say why, and the court's review of the script doesn't support that argument. Given the survey's limited purpose, the court can't find the survey too unreliable for Mr. Crandall to reasonably rely upon it.

The plaintiffs challenge the reliability of Mr. Crandall's analysis of the survey data because his analysis is based on incomplete data and ignores inconsistent data. They say his conclusion—that there is a market to buy and sell delivery routes—fails to account for the 20 percent of his respondents who either didn't recall the amount of the sale or "the thousands of drivers who were apparently unable to sell" their routes. The conflicting data, however, goes to the weight of his conclusion. See In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d at 134-135 (at class certification "a district court may not weigh

17

conflicting expert evidence or engage in 'statistical dueling' of experts" when considering reliability).

Mr. Crandall opines that the "market multiple approach" was "the most common measurement of value considered by FedEx Ground Contractors when they made their decision about route valuation at the time of purchase or sale." The most common answer provided when asked how the value of the route was determined was "whatever price was offered." From this, Mr. Crandall concluded that the contractors used a strategic approach under which they valued their routes after comparing a multiple of their gross revenue to the sales transaction of a comparable business. He also concluded contractors made certain strategic decisions, such as buying undervalued routes. These conclusions don't have the analytical framework to explain how the expert reached his conclusion in light of the contrary data, and seems much more like conjecture than science, and so are unpersuasive and likely inadmissible under a strict Daubert approach. *See* Ramsey v. Consolidated Rail Corp., 111 F. Supp.2d 1030, 1038 (N.D. Ind. 2000) (opinion testimony not admissible under Daubert where the report "contains no explanation as to how any scientific principles support the contrary opinion in the face of eight years of non-detect results in and immediately around the Ramsey well."); *see also* General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

18

Mr. Crandall opines that such a valuation method is common based on his Internet research, but he offers no data from the survey suggesting that these contractors used such a valuation method or considered factors consistent with such a determination. Without evidence that the drivers considered additional factors utilized in a market multiple approach, his conclusion that the drivers engaged in such a behavior is an unpersuasive inferential leap.

Mr. Crandall's background, and more significantly his experience, is sufficient to allow him to testify about business valuation. His survey, although flawed in some aspects, is sufficiently reliable and persuasive to demonstrate what it was intended to show: that there is a market for buying and selling the delivery routes and some routes are sold for consideration. From this, Mr. Crandall concludes that supply and demand influenced route valuations. This seem apparent from the survey and his report. The court finds unpersuasive, however, his conclusion that contractors used a strategic approach whereby contractors valued their routes after comparing a multiple of their gross revenue to the sales transaction of a comparable business.


C

Dr. Jeanneret examined the work activities of FedEx Ground workers. He prepared his report after observing twenty-one FedEx Ground workers in Indiana and Illinois and reviewing summaries of some disputed portions of the depositions of the eighty-six class representatives. In preparation for his report, Dr. Jeanneret

participated in "ride-alongs" with drivers and interviewed various FedEx Ground workers about their work activities. Based on his observations, Dr. Jeanneret prepared a report identifying variations in the drivers' activities across five "work content domains" based in large part on the accepted methodology of the Professional Management and Position Questionnaire (PMPQ). FedEx Ground insists that the report shows important variations in the contractors' work. The plaintiffs contend that the survey is unreliable because the survey and analysis are flawed.

The plaintiffs say the study is unreliable because twenty-one drivers in two states constitutes an improperly drawn sample representative of an appropriately defined population. Dr. Jeanneret didn't base his conclusion on statistical survey data, which would require a higher sample population. Rather, he used direct observation and interviews of 107 drivers, two methods he says are reliable when performing job analysis; he cites to several academic treatises, including Earnest McCormick's "Job Analysis; Methods and Applications." The plaintiffs don't point to any evidence suggesting this isn't a reliable methodology for job analysis. The plaintiffs also say the study was biased because it only focuses on the "differences" in work activities. Dr. Jeanneret, however, says the team considered both similarities and differences, and he had no expectations when the study began.

The plaintiffs argue that there was substantial variation among the work performed by the studied drivers, and one would observe the same range of

20

differences (though not necessarily the same differences) among the greater population. Dr. Jeanneret's report says he used a slightly adapted version of the PMPQ to analyze the drivers' work activities, only adding a work content domain for technical/maintenance/physical activities (carries packages). The plaintiffs don't dispute that the PMPQ is "scientifically established." They say the test requires an examination of the frequency and importance of particular work activities. Dr. Jeanneret states in his declaration that he took these factors into consideration through a qualitative analysis. He did not, however, engage in a quantitative analysis of the frequency and importance of certain work tasks. He cited an academic treatise for the proposition that job analysis generally can either be quantitative or qualitative, but whether the PMPQ requires quantitative standards when reviewing how often a driver engages in certain activities is unclear. Without more, it seems that to compare job tasks it would be important to weigh how often (or how important) certain activities are. Dr. Jeanneret' s conclusion that there was substantial variation among the work performed by the studied drivers is not persuasive.

Dr. Jeanneret also concludes that his study's results can be attributed to the package drivers as a whole. He says he used a method of analysis called "triangulation," whereby a researcher compares different sources of data to discern the presence of epistemological gaps, inconsistences, or errors in knowledge or perception. He says multiple vantage points allowed him to generalize the findings to all contractors—"we can conclude among [ ] the

contractor population at large, there probably will be variations in the major work functions." This is unpersuasive. The term "triangulation" is nowhere in his report, and he didn't consider any other data source that could be compared to the results of his observations and interviews.

Dr. Jeanneret's report is unpersuasive on these points.


D

For these reasons, the court overrules the plaintiffs' motions to strike, but finds the targeted opinions unpersuasive to the extent noted in the preceding sections.


II

The court turns now to the Kansas plaintiffs' motions for class certification.

These plaintiffs challenge the practice of FedEx Group Package System, Inc. of labeling its Ground and Home Delivery division drivers as independent contractors. The plaintiffs assert that even though FedEx represents to its drivers that they are only partnering with FedEx and will essentially own their own business, the FedEx Operating Agreement signed by all FedEx drivers actually reserves to FedEx the right to exercise pervasive control over the method, manner, and means of the drivers' work, rendering improper the drivers' classification as independent contractors rather than employees. For examples of the actual control FedEx asserts over its drivers, the plaintiffs point to FedEx's right to

control the drivers' appearance and behavior, their pay and rates charged to customers, the vehicle they use and its appearance, their route and the number of packages they deliver each day, their delivery methods and mode of customer service, their hours of work, and their opportunity to increase their earnings. The plaintiffs say litigation of this case as a class action is appropriate and desirable since common evidence can resolve all plaintiffs' claims. The plaintiffs contend that FedEx has a categorical policy of classifying its drivers as independent contractors. All class members share the same job title, signed the same non-negotiable Operating Agreement, are paid under the same compensation formula, wear the same uniform, drive FedEx approved trucks bearing the FedEx logo, work exclusively for FedEx, and are all similarly integrated into FedEx's operations.

FedEx responds that the proposed Kansas class should not be certified because the plaintiffs' claims turn on individualized issues, including whether contractors should be classified as employees under Kansas' common law test, whether contractors should be classified as employees under the Kansas Wage Payment Act, and whether any individual contractor can meet the high bar for rescission of his individual contract. FedEx says the named plaintiffs themselves show how diverse this class would be because each contractor's experience is different: some named plaintiffs reviewed the Operating Agreement before signing; some had others drive their routes; some bought their routes from contractors; and one even developed his own alternating day schedule. FedEx further contends

that the proposed ERISA class shouldn't be certified because the named plaintiffs lack standing since they are ineligible for benefits under the plans' own terms, either as individuals or as putative class representatives.

A

To maintain a class action, the named representatives and each class they seek to represent must meet the requirements under FEDERAL RULE OF CIVIL PROCEDURE 23. First, the proposed class action must satisfy all four elements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. A district court has broad discretion in determining whether the plaintiffs have satisfied the prerequisites of Rule 23, Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 596 (7th Cir. 1993), but the court must conduct a rigorous inquiry into the propriety of proceeding as a class before certifying. Livingston v. Associates Finance, Inc., 339 F.3d 553, 558 (7th Cir. 2003). The plaintiffs have the burden of demonstrating they satisfy the class certification prerequisites. Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d at 596.

Numerosity means the proposed class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). No magic number establishes the numerosity requirement, and some courts have found this element satisfied when the putative class consists of fewer than forty members. Lucas v. GC Services L.P., 226 F.R.D. 337, 340 (N.D. Ind. 2005) (collecting cases). "The exact number of class members need not be known. . . [i]nstead, the plaintiff can offer

24

'good faith estimates of class size... and the court may use 'common sense assumptions' to determine the validity of those estimates'." <u>Id.</u> (internal citations and quotations omitted).

The commonality requirement requires only that there exist "questions of law or fact common to the class." <u>Keele v. Wexler</u>, 149 F.3d 589, 594 (7th Cir.1998). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." <u>Id.</u> That there is some factual variation among the class grievances will not defeat a class action. <u>Rosario v. Livaditis</u>, 963 F.2d 1013, 1017 (7th Cir. 1992). Claims arising from a defendant's standardized conduct towards members of the proposed class or from the interpretation of a standard contract often present a case for treatment as a class action. <u>Keele v. Wexler</u>, 149 F.3d at 594 (<i>citing</i> <u>Kleiner v. First Nat'l Bank of Atlanta</u>, 97 F.R.D. 683, 691 (N.D. Ga.1983) ("When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action."); <u>Heartland Communications, Inc. v. Sprint Corp.</u>, 161 F.R.D. 111, 116 (D. Kan. 1995) (certifying class where contracts signed by all class members contained virtually the same provision as that challenged by class representative)).

"The question of typicality in Rule 23(a)(3) is closely related to the preceding question of commonality," <u>Rosario v. Livaditis</u>, 963 F.2d at 1018, but this requirement "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the

class at large." <u>Retired Chicago Police Ass'n v. City of Chicago</u>, 7 F.3d at 596-597. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." <u>De La Fuente v. Stokely-Van Camp, Inc.</u>, 713 F.2d 225, 232 (7th Cir. 1983).

Rule 23(a)(4) requires that the named plaintiff "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). This means that (1) the chosen class representative cannot have antagonistic or conflicting claims with other members of the class, <u>Rosario v. Livaditis</u>, 963 F.2d at 1018; and (2) the class representatives must be willing and able to "vigorously pursue the litigation on behalf of the class," and the attorneys they have chosen to represent the class must be "qualified, experienced and able to conduct the litigation." <u>Scholes v. Stone, McGuire & Benjamin</u>, 143 F.R.D. 181, 186 (N.D. Ill. 1992) (*citing* <u>Secretary of Labor v. Fitzsimmons</u>, 805 F.2d 682, 697 (7th Cir. 1986)).

In addition to these four prerequisites, an action must also be maintainable under at least one of the three provisions of Rule 23(b). That is, the court must decide which form of class action, if any, is the most appropriate under Rule 23(b). <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 163 (1974); <u>Jefferson v. Ingersoll International Inc.</u>, 195 F.3d 894, 898 (7th Cir. 1999) (the court should "endeavor to select the most appropriate subsection, not just the first linguistically applicable one in the list").

26

A court may certify a class under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV .P. 23(b)(2). When a request is made for both declaratory and monetary relief, the class is properly certified under Rule 23(b)(2) only if the request for declaratory relief predominates over the request for monetary relief. Lemon v. International Union of Operating Engineers, Local No. 139, 216 F.3d 577, 580-581 (7th Cir. 2000). That is, the court must decide whether the requested monetary damages are "incidental" to the requested declaratory relief. Jefferson v. Ingersoll International Inc., 195 F.3d at 899. Incidental damages are those "that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." Lemon v. International Union of Operating Engineers, Local No. 139, 216 F.3d at 581 (quoting Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir. 1998)). Incidental damages, therefore, don't depend "in any significant way on the intangible, subjective differences of each class member's circumstances" and don't "require additional hearings to resolve the disparate merits of each individual's case." Allison v. Citgo Petroleum Corp., 151 F.3d at 415.

Rule 23(b)(3) allows class certification when questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. See Szabo v. Bridgeport

27

Machines, Inc., 249 F.3d 672, 676 (7th Cir. 2001). The court looks beyond the pleadings to analyze the claims, defenses, relevant facts, and applicable substantive law that may be necessary to determine whether certification is appropriate. Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996). While individual issues may exist in determining the damages suffered, "it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate." Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 137 (3rd Cir. 2000) (*quoting* Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3rd Cir. 1977)); *see also* In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 139 (2d Cir. 2001) ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); Bertulli v. Independent Ass'n of Cont'l Pilots, 242 F.3d 290, 298 (5th Cir. 2001) (affirming district court's determination that common issues predominated, stating that "[a]lthough calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue"); FED. R. CIV. P. RULE 23(b)(3) ADVISORY COMMITTEE'S NOTES ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of damages suffered by the individuals within the class.").

"To determine whether damages predominate, a court should certify a class on a claim-by-claim basis, treating each claim individually and certifying the class with respect to only those claims for which certification is appropriate." Bolin v. Sears, Roebuck & Co., 231 F.3d 970, 976 (5th Cir. 2000); *See also* FED. R. CIV. P. 23(c)(4); Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 441 (4th Cir. 2003) ("courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case… if [an] action includes multiple claims, one or more of which might qualify as a certifiable class claim"); Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) ("Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues."). The plaintiffs must also show a class action is superior to other available methods for the fair and efficient adjudication of this controversy. FED. R. CIV. P. 23(b)(3); Wahl v. Midland Credit Mgmt. Inc., 243 F.R.D. 291, 299 (N.D. Ill. 2007). One factor often disputed in the superiority analysis (as it is in each of these cases) is "the difficulties likely to be encountered in the management of a class action." FED. R. CIV. P. 23(b)(3)(D). Class actions have been found superior when potential damages might be too insignificant to provide class members with incentive to pursue a claim individually, and where potential plaintiffs may not be aware of their rights or be able to hire competent counsel to protect these rights. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997).

B

The Kansas plaintiffs allege that FedEx's classification of Kansas pickup and delivery drivers as independent contractors violates the Kansas Wage Payment Act. The plaintiffs seek rescission of their operating agreement as contrary to public policy and an unconscionable adhesion contract, as well as declaratory relief that FedEx's employment practices are unlawful under Kansas law. The Kansas plaintiffs seek to certify these claims for class treatment, asserting that the claims are legally and factually common and typical among the following proposed class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since February 11, 1998, to provide package pick-up and delivery services pursuant to the Operating Agreement; and (3) were dispatched out of a terminal in the state of Kansas.

FedEx doesn't contest that the putative class representatives and the proposed Kansas class satisfy the requirements of Rule 23(a), but the court still must conduct its own review. *See, e.g.*, Gammon v. GC Services Ltd. Partnership, 162 F.R.D. 313, 317 (N.D. Ill. 1995) (defendant didn't contest three of the Rule 23(a) requirements and the court's "own independent review" confirmed that those requirements were satisfied). The class representatives include: Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law and Sylvia O'Brien.

The proposed Kansas class likely consists of at least 102 current package and delivery drivers who have entered into the standard operating agreement with FedEx, and an undisclosed number of former drivers who entered into the agreement during the class period. Based on the size of the delivery system in Kansas and other states, as well as the number of current drivers, it is reasonable to infer that the putative class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1).

The plaintiffs say they are entitled to repayment of costs and expenses these drivers paid during their employment, as well as overtime wages, because FedEx wrongfully classified the putative class members as independent contractors under the Kansas Wage Payment Act. To succeed on this claim, the putative members will have to show they are (or were) employees under Kansas law. *See* Crawford v. State Dep't. of Human Resources, 845 P.2d 703 (Kan. Ct. App. 1989). Because the putative class members were uniformly classified as independent contracts, they share several common factual and legal questions regarding their statutory wage claim. *See, e.g.,* Lucas v. GC Servs. L.P., 226 F.R.D. at 340 ("When a question of law refers to a standardized conduct by defendants toward members of the class, a common nucleus of operative facts is typically presented, and the commonality requirement is usually met.").

The plaintiffs also seek the operating agreement's recission as contrary to public policy and an unconscionable adhesion contract. Under Kansas law, a contract that is illegal to enforce is void as against public policy, so in assessing

31

the plaintiffs' rescission claim, the court must examine the operating agreement and the circumstances surrounding its execution and enforcement to determine the agreement's legality. *See* <u>In re Shirk's Estate</u>, 350 P.2d 1, 13 (Kan. 1960). A provision in a contract can make the agreement unconscionable if the provision is, under the circumstances, "so outrageous and unfair in its wording or its application that it . . . is against public policy." <u>Adams v. John Deere Co.</u>, 774 P.2d 355, 357 (Kan. Ct. App. 1989). Because the putative class members all signed the disputed operating agreement, they share several common factual and legal questions relating to the interpretation, execution, and enforcement of the agreement.

The plaintiffs' statutory wage and rescission claims are also typical of the putative class members' claims because they arise from the same event—the drivers' classification as independent contractors—and rest on the same theory—that the drivers have wrongfully been denied wages and have paid unjust enrichment to FedEx as a result of their improper classification under the operating agreement. The plaintiffs and proposed class members all signed a standard-form operating agreement, so the claims of the plaintiffs have the same essential characteristics as the claims of the class at large.

Finally, the named plaintiffs say that they, along with proposed class counsel, can "fairly and adequately protect the interests of the class" as required by Federal Rule of Civil Procedure 23(a)(4). The named plaintiffs include current and former drivers from the Home Delivery and Ground divisions of FedEx, so the

court agrees their interests don't differ from the those of the class as a whole. Nothing in the named plaintiffs' conduct suggests they won't continue to vigorously pursue the litigation on the class's behalf, nor does the record suggest class counsel isn't qualified, experienced, and able to conduct the litigation.

Having determined the plaintiffs and the proposed class meet the Rule 23(a) prerequisites with regard to their Kansas state law claims, the court must determine which form of class action, if any, is appropriate under Rule 23(b). Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 163 (1974). The plaintiffs seek to have their claim for damages under the Kansas Wage Payment Act certified under Rule 23(b)(3), which permits class certification when questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Szabo v. Bridgeport Machines, Inc., 249 F.3d at 676. To answer these questions, the court considers the substantive elements of named plaintiffs' cause of action and inquires into the proof necessary for the various elements. Simer v. Rios, 661 F.2d 655, 672 (7th Cir. 1981).

Like many of the claims in the suit, the Kansas plaintiffs' wage claim hinges on whether they are employees under Kansas law. *See* KAN. STAT. ANN. §§ 44-313 (b) & 314(a); *see also* Herr v. Heiman, 75 F.3d 1509, 1512 (10th Cir. 1996). The Kansas Wage Act circularly defines an employee as "any person allowed or permitted to work by an employer," KAN. STAT. ANN. §§ 44-313 (b), so courts look

33

to the facts and circumstances surrounding the employer-employee relationship to determine the package and delivery drivers' employment status. <u>Herr v. Heiman</u>, 75 F.3d at 1512 (*citing* <u>Wallis v. Secretary of Kansas Dep't. of Human Resources</u>, 689 P.2d 787, 792 (Kan.1984). The Kansas Supreme Court has held that "[a]n employer's right to direct and control the method and manner of doing the work is the most significant aspect of the employer-employee relationship, although it is not the only factor entitled to consideration." <u>Wallis v. Secretary of Kansas Dep't. of Human Resources</u>, 689 P.2d at 792. "An employer's right to discharge the worker, payment by the hour rather than by the job, and the furnishing of equipment by the employer are also indicia of an employer-employee relationship." <u>Id.</u>; *see also* <u>Crawford v. Department of Human Resources</u>, 845 P.2d 703, 706 (Kan. Ct. App. 1989) (listing twenty additional factors Kansas Department of Human Resources uses to determine whether employee-employer relationship exists). FedEx says the court can't make categorical decisions as to the drivers' employment status because the Kansas drivers' varied experiences raise individualized issues.

FedEx first argues that "Kansas courts look to the actual conduct of the parties in determining whether the right to control exists," so determining the ability to control requires the court to engage in an individual analysis of each driver's experience. The court disagrees. In support of its argument, FedEx points to the deposition testimony of a few drivers who say they had control over their schedules, who they hired, their delivery methods, the volume of their packages,

and their delivery route. While courts should look to the actual employment relationship as opposed to an employer's unilateral determination, the nature of the employment relationship is determined by the existence of the right to exercise control, not the actual control FedEx exercised over some employees. Wallis v. Secretary of Kansas Dep't. of Human Resources, 689 P.2d at 792 ("It is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor."). These few drivers' anecdotal experience, therefore, isn't determinative of the employment relationship. Wallis v. Secretary of Kansas Dep't. of Human Resources, 689 P.2d at 795.

In Wallis, a vacuum cleaner distributor contracted with individual dealers, whom the court determined were free to "sell the products in whatever method they feel best accomplishes their goals." Id. Despite the dealers' autonomy in their daily operations, the distributor reserved the right to terminate the contract "in those instances wherein he [found] the dealer to be not representative of the product or product line." The court concluded the distributor hadn't exercised actual control over the dealers, but the fact that the distributor reserved the contractual right to require that dealers comply with distributor's standards evinced an employer-employee relationship. Id. This court, too, must look to the substance of the standard operating agreement that purports to define FedEx's authority over the manner in which the drivers made their pick-ups and deliveries, rather than the actual control FedEx exercised.

The background statement to the operating agreement states that drivers will provide their services as "independent contractors, and not as an employee of [Fed Ex] for any purpose," and that the "method, manner and means" by which the drivers conduct their deliveries are "within the discretion of the Contractor." Despite this acknowledgment, the plaintiffs say the agreement goes on to require that drivers handle their packages using particular methods, cooperate with other FedEx drivers, and foster an image consistent with the FedEx brand. To that end, the plaintiffs say the agreement reserves certain rights to FedEx regarding the manner in which the drivers conduct pick-ups and deliveries.

The plaintiffs say the operating agreement reserves to FedEx the right to (1) "determine whether the truck used by the driver to drive his route is 'suitable for the service called for in the Agreement;'" (2) "determine the identifying colors and the appropriate logo which the driver must use to mark her truck;" (3) "determine what logs, inspection reports and shipping documents the driver must provide to [Fed Ex] at the conclusion of each day;" (4) "determine whether a driver's personal appearance meets the 'consistent image' that [Fed Ex] wishes to project to customers;" (5) "verify through 'customer service rides' and other 'visits' with customers that the drivers is meeting [Fed Ex's] standards of customer service;" (6) "approve any supplemental drivers or helpers the contractor has to employ to substitute for the contractor when he or she needs a day off or some assistance;" (7) "determine and assign the routes that will be covered by the drivers;" (8) "reconfigure or change the driver's route on five days' notice;" (9) "determine, in

36

its sole discretion, the compensation that will be paid to the driver for his services;" and "terminate the contractor if [Fed Ex] determines that the driver has failed to perform her 'contractual obligations' or not renew the driver's contract on 30-days notice." The operating agreement appears to provide common proof of FedEx's authority to control its package and delivery drivers, which allows the court to make categorical determinations of the driver's employment status, so the varying experiences of some drivers doesn't preclude certification.

Still, FedEx says the operating agreement doesn't provide common proof of control because there are material differences between the Ground and Home Delivery operating agreements and because the plaintiffs seek to rescind the agreement on the basis that it doesn't reflect the actual relationship of the parties' actual relationship. First, the court doesn't find the differences highlighted by FedEx to be material to the issue of control, so doesn't agree the differences mitigate the common proof that can be gleaned from the operating agreement. Second, the plaintiffs don't contend that the agreement doesn't reflect the actual employment relationship. They seek to rescind the operating agreement because the agreement was "*designed* to conceal the true nature of the relationship between FedEx [ ]and its drivers: that of employer and employee." The basis of the recision is the various statements purporting to classify [the drivers] [ ] as independent contractors," which creates a "misrepresented legal classification." The plaintiffs put the remaining portions of the operating agreement at issue by arguing that FedEx's right to control stems from such provisions.

37

FedEx argues that determining its ability to terminate drivers at will requires particularized evidence, making this claim unsuitable for class action treatment. FedEx claims the evidence to which the plaintiffs point for support of their contention that FedEx had the right to terminate drivers at will (e-mails between various managers discussing specific terminations) actually supports FedEx's contention that such determinations are highly case specific. This argument confuses the test: it isn't the actual practice of who and how FedEx terminates, but rather whether FedEx reserved the right to terminate drivers at will. When the <u>Wallis v. Secretary of Kansas Dep't. of Human Resources</u> court addressed this element, it didn't look at specific terminations, but rather noted that "Wallis can terminate the contract with the dealer 'in those instances wherein he finds the dealer to be not representative of the product or the product line.'" 689 P.2d at 795. Likewise, the FedEx Operating Agreement states that it may be terminated: "[b]y Contractor or FedEx Ground if the other party breaches or fails to perform the contractual obligations imposed by this Agreement." Deciding whether this element weighs in favor or against the drivers being employees will require the court to focus on the agreement's language, not the specific circumstances surrounding certain drivers' terminations.

FedEx also argues that the methods by which drivers are paid their "settlement checks" vary considerably. They claim drivers' checks are based on the number of stops and the number of packages picked up and delivered; a set figure for making available a qualifying van and operator; a "core zone" payment

particular to each serviced area, which is inversely related to customer density and package volume; and other payments. This formula means contractors servicing areas with a low density of customers and low package volume will receive a significant portion of their settlement in a "core zone" payment, while other contractors who service more concentrated areas may not receive any "core zone" payment.

The plaintiffs don't dispute the earnings calculation, but instead assert that the calculation proves how little control drivers have over how much they earn. They claim that each year FedEx unilaterally re-sets the package and store rates, the "core zone" payment, and announces the changes to the compensation formula in scripted, strictly controlled presentations to the drivers. The drivers can't negotiate any part of the compensation formula, since by the time the changes are announced they already have been incorporated into a take-it or leave-it contract addenda for the drivers to sign. The plaintiffs also assert that the drivers can't grow their business since as the number of stops and packages in a driver's route increase beyond what can be serviced individually, the driver risks having his or her route reconfigured and stops or packages diverted to another driver. The driver can put a supplemental truck on the route to cover the additions, but must absorb that cost.

The court needn't decide at this stage whether the amount of control Fed Ex has over what the drivers are paid supports the contention that an employer-employee relationship exists. The evidence to which the court will look to make

that decision, such as the Operating Agreement and yearly addenda, however, won't require the sort of individual analysis that would make class certification inappropriate.

Finally, FedEx argues that the provision of tools, supplies, and materials may vary by contractor depending on whether he or she purchased a business support package. Too, drivers acquire their vehicles in several ways: leasing through Bush Leasing; another leasing company; or purchasing from FedEx, another driver, or a separate entity. The variations would call for individual analyses rendering this claim unfit for a class action.

The plaintiffs counter by stating that FedEx ultimately retains the absolute right to approve or disapprove any vehicle a driver seeks to use. FedEx sets forth standardized vehicle specifications for each type and class of vehicle in its fleet, including policies on the height, width, and length of vehicles used by drivers. All vehicles must be painted FedEx White, a color Sherwin Williams developed for FedEx. Moreover, although the drivers bear the cost of owning their vehicles, FedEx actually orders and purchases most of the trucks in its fleet and resells those same trucks to drivers at a reduced price. The Operating Agreement requires these vehicles to be maintained in a clean and presentable fashion, free from body damage and extraneous markings. Inspections made by Fed Ex field managers reinforce this requirement. This element, too, can be determined on a class wide basis without the need for an assessment of each individual driver's experience.

40

From these analyses, the court finds that determining whether the drivers are employees under Kansas law will depend upon the amount of control reserved by Fed Ex and will require a detailed analysis of the standard Operating Agreement. These common questions of law and fact predominate over issues affecting only individual members and so support class certification.

For certification under Rule 23(b)(3), a class action must also be superior to other available methods for the fair and efficient adjudication of the controversy. In determining whether a class action is superior, Rule 23(b)(3) provides that the court should consider: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

In this case, these factors support certification. The amount of damages available to individual class members likely wouldn't justify the cost of litigation if members were to proceed on an individual basis. Additionally, though managing a class action this large in one forum will present difficulties, the advantages of concentrating this litigation, such as preventing conflicting judicial decisions, outweigh the difficulties. Class actions have been found superior when potential damages might be too insignificant to provide class members with incentive to pursue a claim individually, and where potential plaintiffs may not be aware of

their rights or be able to hire competent counsel to protect these rights. <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 617 (1997).

For the reasons stated above, certification under 23(b)(3) is appropriate for the Kansas Wage Payment Act claim.

C

Alternative to their claim under the Kansas Wage Payment Act, the plaintiffs have alleged common law claims of rescission, unjust enrichment, and *quantum meruit*. The drivers claim entitlement to rescission of their Operating Agreements on the grounds that those agreements contravene public policy and are unconscionable contracts of adhesion. The plaintiffs argue that Kansas labor statutes demonstrate a clear public policy in favor of providing employees with certain non-waivable employment rights, such as the right to unemployment compensation, workers compensation, and wage law protections. The plaintiffs say that FedEx, by allegedly misclassifying their drivers as independent contractors, undermines the public policy of ensuring their employees these benefits. The drivers further claim that the Operating Agreement meets the standard for unconscionability because it is "so one sided that no fair-minded person would view [it] as just or tolerable." <u>Adams v. John Deere Co</u>, 774 P.2d 355, 358 (Kan. Ct. App. 1989).

The plaintiffs contend that the issues raised by these claims are proper for class certification because they are based on the legality of the Operating

42

Agreement's classification of drivers as independent contractors, which is common to the whole class. Since the plaintiffs seek certification of these claims under Rule 23(b)(3), the court must decide whether the questions of law or fact common to the members of the class predominate over questions affecting only individual members and that a class action is superior to other available methods of adjudication.

FedEx counters that under Kansas law, one who continues to receive the benefits of a contract after learning the facts that would otherwise entitle him to rescission is not entitled to such a remedy. They point to <u>Baker v. Penn Mutual Life Ins. Co.</u>, 788 F.2d 650, 662 (10th Cir. 1986), which provides that:

> Rescission is an equitable remedy designed to afford relief from contracts entered into through mistake, fraud, or duress. Ordinarily, the nature of relief asked in such cases must be such as to place the parties in their original situation. Where one with knowledge of [the] facts entitling him to a rescission of the contract afterwards without duress ratifies it, he is not entitled to have it canceled.... Acts or conduct, inconsistent with an intention to avoid it, or in recognition of the contract, have the effect of an election to affirm it.

(emphasis removed). FedEx argues that individual issues would predominate since the court would need to engage in individualized inquiry of when each class member became aware of the facts entitling him to rescission. As the plaintiffs point out, the drivers allege that FedEx fraudulently misrepresented their legal classification, thereby concealing the true nature of the employment relationship. Until the court ultimately decides the legal nature of this employment relationship, the class members cannot "become aware" of their "employee status".

43

In any event, this claim is suitable for class certification because it is based on alleged misrepresentations contained in the Operating Agreement common to all drivers. FED. R. CIV. P. RULE 23(b)(3) ADVISORY COMMITTEE'S NOTES ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of damages suffered by the individuals within the class"). This claim can be decided on a class-wide basis because common legal and factual questions predominate over individual issues.

FedEx claims that rescission based on unconscionability is similarly unsuitable for class-wide proof, since whether a contract is unconscionable depends on whether similar terms existed in previous contracts between the parties. FedEx also argues that the standard for unconscionability is a high bar, which the drivers cannot meet; the contract must be "so outrageous and unfair in its wording or its application that is shocks the conscience or offends the sensibilities of the court." Adams v. John Deere Co., 774 P.2d 355, 357 (Kan. Ct. App. 1989). First, whether previous contracts between the parties had been executed is only one factor the courts take into consideration. That other contracts were entered into can be considered without examining each individual contract between the drivers and FedEx. Because the bar's height is not relevant at this stage and since this claim can be decided without in-depth individual analysis, it is also fulfills the predominance requirement of Rule 23(b)(3). Lastly, FedEx argues that under Kansas law, unjust enrichment and other quasi-

contractual remedies are not available where an express contract exists. FedEx doesn't believe that the contract can be rescinded and so argues that plaintiffs are not entitled to this relief. Again, whether the plaintiffs can meet their burden to rescind the Operating Agreement does not need to be decided at this stage.

FedEx also raises other substantive legal defenses that do not appear to raise individual issues and thus needn't be considered at this stage.

As stated in the Kansas Wage Payment Act analysis, the class action is the superior method for adjudicating this claim because the high cost of litigation would likely preclude most individual class members from bringing this lawsuit and this method will also promote judicial efficiency by having all of these common claims decided in one forum.

Class certification for plaintiffs common law claims is appropriate under Rule 23(b)(3).

D

The named Kansas plaintiffs, along with three additional package delivery drivers, seek to certify a national ERISA class action for recovery under 29 U.S.C. § 502(a)(1). The putative class members seek declaratory relief regarding their participant status and entitlement to benefits under the ERISA plans, as well as payment of benefits to which they are entitled, but were improperly denied as a result of their misclassification. They seek certification of an ERISA class defined as:

45

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were eligible for ERISA plan benefits, absent their mischaracterization as independent contractors

FedEx doesn't contest that the named plaintiffs and the proposed ERISA class satisfy the numerosity, commonality, and typicality requirements of Rule 23(a), but as before, the court still conducts its own review. *See, e.g.*, Gammon v. GC Services Ltd. Partnership, 162 F.R.D. 313, 317 (N.D. Ill. 1995)(defendant didn't contest three of the Rule 23(a) requirements and the court's "own independent review" confirmed that those requirements were satisfied).

The proposed ERISA class likely consists of "thousands of P & D drivers across the country" whom the named plaintiffs say "have been improperly denied benefits based on the mischaracterization of their employment status" so it is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1).

The commonality requirement requires only that there exist "questions of law or fact common to the class." Keele v. Wexler, 149 F.3d 589, 594 (7th Cir. 1998). FED. R. CIV. P. 23(a)(2). That means, "[a] common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." Id. The putative class members' ERISA claim also hinges on their allegation that they were misclassified as independent contracts, so the court will need to focus on FedEx's treatment of the package and delivery drivers, specifically FedEx's right

to control the manner and means by which the drivers carried out their job functions. This constitutes a common nucleus of operative fact. *See, e.g.,* Breedlove v. Tele-Trip Co. Inc., No. 91-C5702, 1993 WL 284327, at *4-6 (N.D. Ill. July 27, 1993)(*citing* Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318, 323 (1992) ("In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.")).

"The question of typicality in Rule 23(a)(3) is closely related to the preceding question of commonality," Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992), but this requirement "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 596-597 (7th Cir. 1993). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983). The named plaintiffs' claims are typical of the putative class members' claims because the claims rest on the same theory—that the drivers have wrongfully been denied employee benefits under several ERISA plans as a result of their mischaracterization as independent contractors. The plaintiffs, like the putative class members, signed a standard-form operating agreement and their participant status under the FedEx's ERISA plans depends on their treatment by FedEx.

47

"Whether the named plaintiffs properly represent the class' interest depends upon a number of factors including: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the absentee members." <u>Secretary of Labor v. Fitzsimmons</u>, 805 F.2d 682, 697 (7th Cir. 1986). FedEx doesn't challenge the adequacy of plaintiffs' counsel, and nothing in the record suggests counsel aren't "qualified, experienced and able to conduct the litigation." <u>Scholes v. Stone, McGuire & Benjamin</u>, 143 F.R.D. 181, 186 (N.D. Ill. 1992) (*citing* <u>Secretary of Labor v. Fitzsimmons</u>, 805 F.2d at 697). Rather, FedEx says the named plaintiffs cannot adequately represent the ERISA class because they lack standing to bring a claim for benefits under the identified ERISA plans. The court disagrees.

A class action may not be certified unless the named plaintiff has standing to seek the relief requested. <u>O'Shea v. Littleton</u>, 414 U.S. 488, 494 (1974) The parties don't dispute that the named plaintiffs have standing under Article III because they claim a direct, substantial, and tangible interest. *See* <u>Harzewski v. Guidant Corp.</u>, 489 F.3d 799, 803 (7th Cir. 2007) ("Obviously the named plaintiffs have standing to sue in the sense of being entitled to ask for an exercise of the judicial power of the United States as that term in Article III of the Constitution has been interpreted, because if they win they will obtain a tangible benefit."). The court therefore understands FedEx's use of the term "standing" as denoting the right to obtain a particular form of judicial relief. Such "nonconstitutional standing" requires that the plaintiff be in "the 'zone of interest' of the statute or

48

other source of rights under which he is suing." Harzewski v. Guidant Corp., 489 F.3d at 803 (citing Coan v. Kaufman, 457 F.3d 250, 256 (6th Cir. 2006) ("Although we have referred to a plaintiff's status as a 'participant' under ERISA as a question of 'standing,' [ ] it is a statutory requirement, not a constitutional one" and "[u]nlike Article III standing, which ordinarily should be determined before reaching the merits. . . .")(citations omitted)).

Prudential standing requires that a plaintiff seeking to recover benefits due to him under an ERISA plan be a "participant or beneficiary." 29 U.S.C. § 1132(a)(1); see also Miller v. Rite Aid Corp., 334 F.3d 335, 340 (7th Cir. 2005) ("ERISA... restricts civil actions against a plan administrator to actions brought by a 'participant or beneficiary'."). Participant status requires that the plaintiff show he is an employee and has a colorable claim for vested benefits under the plan's terms. Sallee v. Rexnord Corp., 985 F.2d 927, 929 (7th Cir. 1993). But unless it is an "extreme case"—one in which the party has no possible legally protected interest in the pension plan—"whether an ERISA plaintiff is a 'participant' entitled to recover benefits under the Act should be treated as a question of statutory interpretation fundamental to the merits of the suit rather than as a question of the plaintiff's right to bring the suit." Harzewski v. Guidant Corp., 489 F.3d at 804.

The named plaintiffs, and the class members they wish to represent, seek benefits under six FedEx benefit plans: (1) a wealth accumulation 401(k) plan; (2) a group life plan; (3) a short-term disability plan; (4) a long-term disability plan;

(5) a medical, dental, and vision care plan; and (6) a dependent care account plan. Each plan defines the term "employee," but courts look to the common-law employee test to determine a hired party's status for purpose of ERISA benefits. *See* <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 323-324 (1993). Whether the named plaintiffs are common law employees is unclear at this stage.

Still, the named plaintiffs must demonstrate a colorable claim of eligibility under the language of the plan because ERISA doesn't require employers to make their ERISA plans available to all common law employees. *See* <u>Bauer v. Summit Bancorp</u>, 325 F.3d 155, 164 (3rd Cir. 2003) (adopting the reasoning of multiple circuits to find that "ERISA does not preclude an employer from denying participation in an ERISA plan if the employer does so for reasons other than age or length of service."); <u>Bronk v. Mountain States Tel. and Tel., Inc.</u>, 140 F.3d 1335, 1338 (10th Cir. 1998) (circuit court disagreed with the district court that ERISA's minimum participation standards require that leased employees who meet the test for common law employee status be automatically included in the company's plan, whether or not they were excluded under the terms of the plan). At least two of the plans, the medical plan and the 401(k), purport to exclude coverage to drivers classified by FedEx as independent contractors, "regardless of whether such individuals are subsequently reclassified by a court . . . as common law employees." FedEx says that under the terms of these plans, the named plaintiff cannot fall within the class of people who are eligible to receive benefits thereunder. The court disagrees.

50

This case isn't <u>Jaeger v. Matrix Essentials</u>, where the court declined to determine the plaintiff's employee status because it found the limiting language in the benefit plan—that employees who were not treated as employees for tax purposes were not to be covered—precluded coverage irrespective of the employment relationship. 236 F.Supp.2d at 825. The <u>Jaeger</u> court concluded that whether Ms. Jaeger was a common law employee and whether she was eligible for benefits were independent inquiries because tax treatment is only one of several <u>Darden</u> factors to be considered. Ms. Jaeger could have been a common law employee but still ineligible for benefits because she wasn't treated as such for tax purposes. <u>Id.</u> In our case, however, whether the named plaintiffs are common law employees and whether they are eligible for benefits under the plan's express terms aren't mutually exclusive inquiries. *See, e.g.,* <u>Burrey v. Pacific Gas & Elec. Co.</u>, 159 F.3d 388 (9th Cir. 1998) (ERISA plan excluded leased employees but because the definition incorporated the common law employee definition, the court reasoned that if a person was determined to be common law employee, he or she was not a leased employee).[1]

If the court determines that the named plaintiffs are common law employees, they can't be independent contractors, despite FedEx classifying them

---

[1] That is not to say a company cannot exclude "leased employees," <u>Abraham v. Exxon Corp.</u>, 85 F.3d 1126, 1130 (5th Cir. 1996), or provide coverage only to "regular employees." <u>Bronk v. Mountain States Tel. & Tel., Inc.</u>, 140 F.3d at 1338; *see also* <u>Wolf v. Coca-Cola Co.</u>, 200 F.3d 1337, 1342 (11th Cir. 2000) ([H]er claim for ERISA benefits fails the second prong because she is specifically excluded from eligibility by the terms of Coca-Cola's ERISA plan. The plan includes regular employees and excludes temporary and leased employees.").

as such, so by demonstrating they are common law employees, the package drivers can satisfy both prongs of eligibility. *See, e.g.,* Burrey, 159 F.3d 388; Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1492-1493 (11th Cir. 1993). Indeed, allowing an employer to define participant status through exclusionary language that denies coverage to those parties based solely on the employer's classification of them as independent contractors, regardless of the reality of the employment relationship, runs contrary to the teachings of Darden. Despite the language purporting to deny newly-determined employees participant status, whether the named plaintiffs are employees eligible for benefits under the FedEx plans is a question fundamental to the merits of this lawsuit, which should be addressed at summary judgment rather than as a question of the plaintiff's right to bring the suit. The court can't say the named plaintiffs inadequately represent the class due to a lack of "standing." The plaintiffs have sufficiently demonstrated that they satisfy the class certification prerequisites Rule 23(a).

The court must determine which form of class action, if any, is appropriate under Rule 23(b). Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 163 (1974). The plaintiffs seek to certify a class pursuant to Rule 23(b)(2), which allows a class to be certified if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). FedEx says the plaintiffs' ERISA claims aren't appropriate for class

treatment under Rule 23(b)(2) because the plaintiffs' claim for declaratory relief is incidental to their monetary request. The court can't agree.

The named plaintiffs seek both declaratory and monetary relief, so the class is properly certified under Rule 23(b)(2) only if the request for declaratory relief predominates over the request for monetary relief. Lemon v. Int'l. Union of Operating Engineers, Local No. 139, 216 F.3d 577, 580-581 (7th Cir. 2000). The court must decide whether the requested monetary damages are "incidental" to the requested declaratory relief. Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 899 (7th Cir. 1999). Incidental damages are those "that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." Lemon v. International Union, 216 F.3d at 581(quoting Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir. 1998)). "[I]ncidental damages do not depend 'in any significant way on the intangible, subjective differences of each class member's circumstances' and do not 'require additional hearings to resolve the disparate merits of each individual's case'." Id.

Fed Ex's treatment of the package and delivery drivers as independent contractors and denial of benefits on those grounds can fairly be characterized as a course of conduct that is "generally applicable" to the proposed class. See, e.g., Breedlove v. Tele-Trip Co. Inc., No. 91-C5702, 1993 WL 284327, at *9 (N.D. Ill. July 27, 1993). And because the named plaintiffs seek benefits that were not paid as a result of their alleged uniform improper classification, the requested monetary relief is incidental to the declaratory relief with respect to the class

members' rights under the subject plans. <u>Bublitz v. E.I. du Pont de Nemours & Co.</u>, 202 F.R.D. 251, 259 (S.D. Iowa 2001); <u>Fuller v. Fruehauf Trailer Corp.</u>, 168 F.R.D. 588, 603 (E.D. Mich. 1996); <u>Jansen v. Greyhound Corp.</u>, 692 F. Supp. 1022, 1028 (N.D. Iowa 1986). Certification under Rule 23(b)(2) is therefore appropriate.

The named plaintiffs also seek certification under Rule 23(b)(3), which allows class certification when questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. <u>Szabo v. Bridgeport Machines, Inc.</u>, 249 F.3d at 676. FedEx says the individualized nature of the statute of limitations defense renders the ERISA claims unsuitable for class treatment. The court disagrees.

Individualized statute of limitations determinations weigh against certification under Rule 23(b)(3), but courts have rejected a per se rule that the presence of such issues compels a finding that individual issues predominate. *See* <u>In re Linerboard Antitrust Litigation</u>, 305 F.3d 145, 162 (3rd Cir. 2002) ("[T]he mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones."); <u>Waste Mgmt. Holdings, Inc. v. Mowbray</u>, 208 F.3d 288, 296 (1st Cir. 2000) (same). Rather, "[a]s long as a sufficient constellation of common issues binds class members together, variations in the sources and application of

54

statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)." <u>Id.</u>

A claim under ERISA section § 502 accrues upon a clear and unequivocal repudiation of a claim to benefits. <u>Miles v. N.Y. State Teamsters Conference Pension & Retirement Fund Employee Pension Ben. Plan</u>, 698 F.2d 593, 598 (2d Cir. 1983). Both sides seem to agree that the court will need to look to when the putative class members should have known they would be denied benefits, but the parties disagree on whether signing the operating agreement served as an unequivocal repudiation of the putative class members' claim to benefits. This disagreement doesn't preclude class certification. While notice of repudiation may differ depending on each defendant, "[c]hallenges based on the statute of limitations . . . have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability." <u>In re Linerboard Antitrust Litigation</u>, 305 F.3d at 162 (<i>quoting</i> NEWBERG & CONTI, NEWBERG ON CLASS ACTIONS, § 4:26 (3d ed.)); The predominate issue for purposes of liability under the Fed Ex ERISA plans is whether the putative members are eligible employees, and because this issue arises from a common nucleus of facts, it can be demonstrated by common proof and certification is therefore economical and appropriate. <i>See, e.g.,</i> <u>Waste Mgmt. Holdings, Inc. v. Mowbray</u>, 208 F.3d at 296; <u>Hoxworth v. Blinder, Robinson & Co., Inc.</u>, 980 F.2d 912, 924 (3rd Cir. 1992). Individual statute of limitations issues can and should be addressed

55

separately with damages. In re Revco Securities Litigation, 142 F.R.D. 659, 663 (N.D. Ohio 1992); In re Plywood Anti-Trust Litigation, 76 F.R.D. 570, 586 (E.D. La 1976). Moreover, class treatment of the named plaintiffs' ERISA claim is superior to individual trials for adjudication of the matter because it will likely save time and money, as well as prevent different courts from interpreting the employment relationship differently. Breedlove v. Tele-Trip Co. Inc., No. 91-C5702, 1993 WL 284327, at *11. Certification under 23(b)(3) is also appropriate.

While the proposed ERISA class can be appropriately certified under both Rule 23(b)(2) and Rule 23(b)(3), the court must decide which form of class action, if any, is the most appropriate under Rule 23(b). Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 163 (1974); Jefferson v. Ingersoll International Inc., 195 F.3d 894, 898 (7th Cir. 1999) (the court should "endeavor to select the most appropriate subsection, not just the first linguistically applicable one in the list").

Certification under Rule 23(b)(3) is more appropriate in this case so potential class members will retain the ability to opt-out of the class if they so choose. A class maintained under Rule 23(b)(2) doesn't require that members have the option of not being part of the class. Accordingly, the court concludes that the ERISA class should be maintained under Rule 23(b)(3), which is more suited to claims for monetary damages and contains a provision requiring notification to class members of their opt-out option.

III.

For the foregoing reasons, the court DENIES the plaintiffs' motions to strike (docket nos. 684, 686, 690), GRANTS the Kansas and ERISA plaintiffs' motions for class certification (docket no. 551), and DENIES defendant's request for oral argument on plaintiffs' motions for class certification (docket no. 627).

The parties are ordered to confer regarding the preparation of a notice to the members of the classes pursuant to Federal Rule of Civil Procedure 23(c)(2)(B) and submit an agreed proposed notice (or separate proposals if they cannot reach agreement, supported by appropriate citations to case law) to the court by no later than October 31, 2007.

All parties that have filed briefs on class certification shall file, within 30 days of this order, a supplemental statement, not to exceed five pages, stating how their position on class certification differs from the positions addressed in this opinion. All class certification briefs yet to be filed also shall contain such a statement.

SO ORDERED.

ENTERED:    October 15, 2007

            /s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Chief Judge
United States District Court

57