**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| | | Judge Robert L. Miller, Jr. |
| ALL ACTIONS | ) ) ) | |

## REPORT OF PROPOSED ALLOCATION OF THE ATTORNEY'S FEES

### I.    INTRODUCTION

Co-Lead Counsel and the Plaintiffs' Steering Committee ("PSC"), hereby submit this Report of Proposed Allocation of the Attorney's Fees Awarded by this Court ("Proposed Allocation") in 19 of the 20 Settled MDL Cases ("Settled Cases").[1]  On June 30, 2017, settlement payments were mailed to over 10,000 class members in all cases except New Jersey and Kansas.[2] The last remaining task before this Court, therefore, is presiding over the allocation of the attorney's fees between the attorneys whose collective efforts created the common fund settlements for the benefit of the certified classes.

As discussed at the final approval hearings of the 20 Settled Cases held on March 13 and 14, 2017, the Co-Lead Counsel and the PSC developed a framework for allocating the attorney's

---

[1] *See* AL Doc. No. 195, AZ Doc. No. 152, GA Doc. No. 146, IN Doc. No. 224, KS Doc. No. 253, LA Doc. No. 103, MD Doc. No. 144, MN Doc. No. 220, NC Doc. No. 151, NJ Doc. No. 257, NY Doc. No. 216, OH Doc. No. 87, PA Doc. No. 223, RI Doc. No. 213, SC Doc. No. 218, TN Doc. No. 227, TX Doc. No. 219, UT Doc. No. 120, WI Doc. No. 216 and WV Doc. No. 175. This Proposed Allocation does not incorporate the attorney's fees awarded in the New Jersey *Tofaute* case because a notice of appeal has been filed and the settlement has not yet been funded.  Fees awarded in the New Jersey case will be allocated pursuant to the same framework outlined herein.

[2]  The Kansas class members will be paid in August 2017, as the final judgment was entered on June 21, 2017 and there were no objections.

fees and expenses awarded by this Court to Class Counsel both to the firms that filed the Settled Cases and that devoted time and resources to bringing each one to a successful resolution despite very long odds, while they were on appeal to the Seventh Circuit from adverse judgments entered by this Court. After extensive deliberation and following a thorough audit of the time records submitted by all counsel throughout this litigation, the Co-Lead Counsel and the PSC propose to allocate the fees awarded as follows:  (1) reimbursement of unreimbursed expenses to all counsel from the aggregate of the fees awarded in the 19 cases; (2) payment of 15% of the fee awarded for each of the 19 cases to be paid to the attorney or group of attorneys who commenced the case, to be divided among them per their own agreements; and (3) payment of the remainder of the fees awarded in each case to those firms that contributed to the work of the MDL in *pro rata* shares relative to the total audited lodestar of all contributing firms.

The Co-Lead Counsel have maintained to all counsel and this Court, from the inception of this case, that the guiding principle for allocating attorney's fees awarded would be the relative contribution of each firm, measured objectively by each firm's relative lodestar while the cases pended in the MDL, to provide fair compensation to all firms for their efforts with a windfall to none.  Co-Lead Counsel believe the Proposed Allocation accomplishes this goal, is fair and appropriate, and should be approved by the Court.

## II.      STATEMENT OF FACTS

In August 2005, the Judicial Panel on Multi-District Litigation ("JPML") granted FXG's motion to consolidate the state-wide class action lawsuits challenging the independent contractor classification of FXG's pickup and delivery drivers into this MDL proceeding.  MDL Doc. No. 1.  The consolidation encompassed all pretrial proceedings, including but not limited to written discovery and depositions, non-dispositive motions, expert work, class certification, and summary adjudication.  In its initial case scheduling order entered November 15, 2005, this

Court bifurcated the proceedings into liability and damages phases with simultaneous class certification and merits discovery.  MDL Doc. No. 52.  The pretrial order separated summary adjudication into two phases, independent contractor classification and summary adjudication as to other matters.  MDL Doc. No. 58.

The Court appointed three counsel to serve as Co-Lead Counsel for Plaintiffs in the coordinated proceedings[3] and authorized them to coordinate all aspects of the pretrial proceedings, including the following:

1) Determine for the Court and opposing parties the position of the plaintiffs in all matters arising during pre-trial proceedings;

2) Delegate specific tasks to other counsel in a manner to ensure that pretrial preparation for plaintiffs is conducted effectively, efficiently, and economically;

3) Enter into stipulations with opposing counsel necessary for the conduct of the litigation;

4) Prepare and distribute to the parties periodic status reports;

5) Maintain adequate time and disbursement records covering services and expenditures of plaintiffs' counsel;

6) Monitor the activities of co-counsel to ensure that schedules are met and unnecessary expenditures of time and funds are avoided;

7) Maintain complete files with copies of all documents served upon them and shall make such files available to all Plaintiffs' counsel;

8) Maintain and make available to all counsel and the Court an up-to-date service list;

9) Receive and, as appropriate, distribute to co-counsel orders from the Court, and documents from opposing parties and counsel;

10) Represent plaintiffs in all mediation proceedings and settlement negotiations; and

---

[3]  The Court appointed Susan Ellingstad of Lockridge Grindal Nauen P.L.L.P., Robert Harwood of Harwood Feffer LLP, and Lynn Faris of Leonard Carder, LLP.  Beth Ross assumed Ms. Faris' role as Co-Lead Counsel for Leonard Carder after Ms. Faris retired in 2011.

11) Perform such other duties as may be incidental to proper coordination of plaintiffs' pretrial activities or authorized by further Order of this Court.

MDL Doc. No. 52 at 3-4.

The Court also appointed three additional counsel to serve on the PSC.[4]  The PSC was assigned the following duties:  1) Assisting with the coordination of the activities of plaintiffs during pretrial proceedings; 2) Monitoring the activities of co-counsel to assure that schedules are met and unnecessary expenditures of time and expense are avoided; and 3) Performing such other duties as may be incidental to proper coordination of plaintiffs' pretrial activities or authorized by further order of the Court.  MDL Doc. No. 52 at 6.

In 2008 and 2009, the Court appointed the three Co-Lead Counsel to serve as Class Counsel representing the classes of FXG drivers in each one of the 26 cases that were ultimately certified for class adjudication.  MDL Doc. No. 1131.

**A.    The Six Co-Lead Counsel And PSC Firms Performed More Than 80% Of The Substantive Work on the Cases, And Funded More Than 75% Of The Litigation Costs.**

The six Co-Lead Counsel and PSC firms collectively brought decades of MDL, complex class action, and employment law expertise to these cases.  The Co-Lead Counsel, with the assistance and counsel of the PSC firms, were responsible for overall case management and coordination, and formulated the strategy in every phase of the litigation.  The six firms collectively performed no less than 80% of the work in these cases during the last 12 years, and almost all of the substantive work during the past 6 years after the cases were lost on summary

---

[4] The PSC is comprised of Gordon Rudd of Zimmerman Reed; Jordan Lewis of Siegel Brill; and Jerald Cureton of Cureton Caplan.  Christopher Penwell replaced Jordan Lewis as PSC member for Siegel Brill when Mr. Lewis left the firm in 2010, and Anthony Marchetti of Cureton Caplan (now Marchetti Law) replaced Jerald Cureton when he retired from Cureton Caplan in 2010.

judgment, which ultimately brought these cases to a successful resolution. Co-Lead Counsel Declaration ("Decl.") ¶ 3.

The Co-Lead Counsel and PSC firms were the joint architects of the overall litigation strategy.  The discovery strategy was designed to create an evidentiary record of common evidence to prove the employment status of the Plaintiff drivers under the governing state law in each constituent case, while also developing evidence from FXG's regional, divisional and terminal management within each state to position the constituent cases for trial in the event of transfer back to their home jurisdictions.  Decl., ¶ 5.  Co-Lead Counsel estimate that at least 80% of the work performed in the MDL was directed to establishing the employment status of the drivers in each case under applicable state law – the issue that led to creation of the MDL docket. Decl., ¶ 4.

The litigation strategy also encompassed the class certification strategy, including the decision to seek certification of the broadest possible classes (defining the class to include multiple work area and incorporated drivers); the summary adjudication strategy, including the decision to seek summary adjudication of the drivers' employment status to avoid trials on that issue; the appellate strategy, including the decision to seek reversal of the order denying the Plaintiffs' affirmative motions for summary adjudication which proved a key driver for settlement negotiations; and the settlement strategy that resulted in the settlements of every remaining case in the MDL docket.  Decl., ¶ 6.

The Co-Lead Counsel and PSC firms also assumed responsibility for funding the vast majority of the litigation costs during the 12 years of this proceeding:  the Co-Lead Counsel contributed $1,295,000 in assessments and advanced $1,215,271.47 in held costs; the PSC firms

contributed $688,500.00 in assessments and $505,364.41 in held costs; for a total of $1,983,500.00 in assessments and $1,720,635.88 in held costs. *See* Ex. 3.[5]

### B. The Co-Lead Counsel Assigned Work To Other Counsel In The MDL Who Had The Interest, Skills, And Resources To Make Meaningful Contributions During The Trial Court Proceedings.

Between 2005 and 2010 when these cases were in active litigation before the district court, Co-Lead Counsel distributed work to participating firms based upon their expressed interest as well as their availability, resources and capabilities.  Every one of the non-lead counsel had the opportunity to participate in the MDL litigation effort, and none who showed interest and capacity were denied work.  Decl., ¶ 7.  The Co-Lead and PSC firms convened approximately ten quarterly meetings of counsel in different parts of the country between 2005 and 2009 for the purpose of keeping the local counsel up-to-date on the progress of the litigation, discussing litigation strategy and tactics, and soliciting volunteers to participate on committees and perform other assigned work.  All counsel were encouraged to attend these meetings and most did.  Of relevance here, the subject of attorney's fees – and how those fees would be distributed at the end of the cases – was raised and discussed at every one of these meetings. Each time the subject arose, the Co-Lead Counsel reiterated that any attorneys' fees awarded would be distributed to those who performed assigned and authorized work based on lodestar. Decl., ¶¶ 8-9.

During the active phases of the trial court proceedings, the Co-Lead Counsel assembled and chaired a number of committees that were responsible for handling different aspects of the litigation, and solicited local counsel to participate. These included a pleadings committee; several discovery and document review committees; affirmative and defensive deposition teams;

---

[5]  All Exhibits referenced herein are hereby attached to Co-Lead Declaration, filed herewith.

a class certification briefing committee; an expert committee; and a summary judgment briefing committee.  Firms that volunteered to work were given assignments commensurate with their skill sets, resources, and availability.  Decl., ¶ 10.  Some firms performed work pertaining solely to the cases they originated (such as assisting with responding to written discovery and production requests propounded to the Named Plaintiffs), while others expressed interest in and were assigned work more generally applicable to the cases as a whole (e.g. legal research, document review and analysis, affirmative depositions, and brief writing).  Decl., ¶ 11.

The pleadings committee reviewed the claims asserted in the cases that had been transferred into the MDL; researched the various states' laws and solicited legal research from the local attorneys as to the available legal theories in their respective states; and strategized about legal theories and uniform claims to assert in each of the cases.  The Co-Lead Counsel then amended the complaints in all of the cases based on the committee's work.  Decl., ¶ 12.

The Co-Lead Counsel and PSC firms handled most of the depositions taken of FXG's corporate representatives, and crafted the offensive written discovery and document requests propounded to FXG.  Several local counsel firms were also assigned affirmative depositions based on location of FXG personnel or particular areas of inquiry.  Co-Lead Counsel drafted templates and worked with local counsel in responding to discovery served on the 215 class representatives, which included, *inter alia,* obtaining information, collecting documents and preparing formal responses to written discovery and production requests.

The Co-Lead Counsel established a deposition defense team comprised of four core PSC members who were responsible for preparing the Named Plaintiffs and defending and staffing the 215 class representative depositions.  A number of the local attorneys also served on the deposition defense team and defended the depositions of the class representatives in cases

initiated by others.  All other local counsel were invited to assist in the preparation and defense of the class representatives' depositions in the cases they initiated, and most (but not all) did so. Decl., ¶ 13.

Co-Lead Counsel also assembled teams of Plaintiffs' attorneys to work on a number of subject matter-driven document analysis projects so that the 3-plus million documents produced by FXG could be effectively used to support the litigation strategy.  These included, *inter alia*, corporate documents and emails, operational policies, procedures, management and driver training manuals and videos, insurance policies and employee benefit materials, state and federal agency decisions, and terminal specific documents pertaining to hiring, route management and sales, supervision, discipline, and termination  of the plaintiff drivers.  Decl., ¶ 14.  The FXG documents were initially reviewed, coded and stored in an electronic document depository maintained by Co-Lead Counsel that was accessible to all participating counsel throughout the MDL and afterwards. The key documents in particular subject matter areas were later culled and compiled for use in depositions and to support the major motions filed in the case.   A number of firms volunteered and devoted significant resources to the coding review, and analysis of the FXG documents for use in depositions and motion practice.  Several of the local counsel firms hired contract attorneys to assist with the massive amount of document review work when Co-Lead Counsel could not find sufficient volunteers among the existing local counsel to complete the work.  Decl., ¶ 15.

Co-Lead Counsel established committees to work on both the class certification and summary judgment filings in the 42 cases that were initially pleaded as class actions, including factual and legal research, document review and analysis, class member declarations, collateral motions, and briefing.  The Co-Lead Counsel prepared the omnibus and model briefs and factual

presentations, while briefing committees comprised of the Co-Leads, the PSC, and other Plaintiffs' counsel drafted the state specific briefing in 42 cases based on models prepared by the Co-Lead Counsel.  To ensure consistency and quality, the briefing teams were comprised of select groups of attorneys with writing expertise who prepared briefs in consolidated cases beyond those they initiated.  Decl., ¶ 16.

The offensive and defensive expert witness work (including discovery, depositions, reports and *Daubert* motions)  was handled exclusively by the Co-Lead Counsel and PSC firms, as were all administrative matters, all negotiations with FXG counsel pertaining to, e.g. case management and administration, scheduling, discovery issues, routine administrative filings, discovery and other dispositive motion practice, and the Rule 23(f) appeal taken  by FXG to the Seventh Circuit from the class certification orders.  Decl., ¶ 17.

**C.** **The Co-Lead Counsel Performed The Vast Majority Of Work In The Cases After They Were Lost In 2010, Ultimately Resulting In Successful Settlements.**

While risk of loss and non-recovery always existed in this MDL – which involved a challenge to FXG's nationwide business model and the assertion of novel and untested legal claims and theories in nearly all of the constituent cases -  that risk was especially pronounced from 2011 forward after the cases were lost and on appeal.  Despite this risk, Co-Lead Counsel devoted significant time and resources to litigating the *de facto* lead appeal in the *Craig* case, which sought an appellate ruling that the Plaintiff drivers were employees as a matter of law, and through the extended settlement process.  They represented the Plaintiffs in all cases before the Seventh Circuit, prepared multiple rounds of briefs for the Seventh Circuit pertaining to the *Craig* appeal; prepared the briefs submitted to the Kansas Supreme Court pertaining to the certified questions and additional briefing at the Seventh Circuit.  They also and participated in numerous case management conferences with the Circuit Executive regarding the orderly

administration of the 19 stayed appeals through the settlement process and entry of final judgment by this Court.  By the time the *Craig* mandate issued on July 30, 2015, the appeals in the other 19 cases remaining in the MDL docket had been stayed for more than four years and were not finally dismissed until after the MDL class settlements were approved.

FXG did not approach the Co-Lead counsel to explore the possibly of mediating the twenty cases that remained of the MDL docket until July 2015, after Plaintiffs had succeeded on appeal before the Seventh, Ninth and Eleventh Circuits (and the Kansas Supreme Court), and only after reaching a substantial class action settlement in the remanded California case, where it had the most exposure, in June 2015.  That settlement is now on appeal.  Decl., ¶ 18.

Thereafter, the Co-Lead Counsel prepared the twenty remaining MDL cases for mediation, work that was extremely labor intensive and took many months.  Before mediation could begin in earnest, the parties conducted comprehensive damage discovery, created damages models corresponding to the legal theories, and prepared detailed case valuations and risk analyses in view of the particular state law remedies and affirmative defenses in each case. Co-Lead Counsel engaged a forensic accounting expert to analyze comprehensive class-wide damage data produced by FXG spanning the 18-year liability period and together we developed damage and exposure models to guide negotiations and to use as the basis for settlement payment allocation that was approved by the Court. Co-Lead Counsel prepared comprehensive mediation statements summarizing the substantive law and FXG's exposure in each case. Decl., ¶ 19.

From January to March of 2016, Co-Lead Counsel mediated each case and were ultimately successful in negotiating settlements in each of them.  The local attorneys were all provided the opportunity to review, comment and discuss the mediation presentations and

damages models and to participate in the negotiations along with the class representatives, and most did.  Decl., ¶ 20.

Once the cases were settled, the Co-Lead Counsel worked with FXG to draft the formal settlement agreements.  The originating attorneys worked with the class representatives to obtain their signatures on those agreements.  The Co-Lead Counsel, with assistance from the PSC firms, prepared all of the filings necessary to obtain preliminary and final approval of the twenty class settlements – including motion practice before this Court and the Seventh Circuit to secure this Court's jurisdiction over the settlement proceedings while all but the *Craig* case remained on appeal – the class notice and settlement administration, and the attorney fee awards.  Decl., ¶ 21.

The Co-Lead firms' responsibilities for administering the settlements in these cases will continue for at least the next twelve months, including but not limited to taking telephone calls from class members across the country (which the local attorneys will also share in), attempting to locate class members whose checks are returned as undeliverable or uncashed so that they obtain the benefits of these settlements, overseeing the second round distribution of settlement payments after the stale date for the first round of checks passes in January 2018, and facilitating distribution of any residual proceeds to the designated *cy pres* beneficiaries.  Decl., ¶ 22.

### D.     Plaintiffs' Counsel Were Instructed That Compensation Would Be Based On The Audited Lodestar Of Each Firm.

From the inception of this MDL in 2005 through the settlements of the twenty remaining cases in 2016, the Co-Lead Counsel repeatedly communicated to all Plaintiffs' counsel that any fees ultimately recovered would be distributed to firms based on a lodestar analysis for work assigned and authorized by the Co-Lead Counsel and documented by detailed and contemporaneous time records that adequately described the work performed.

On October 21, 2005, just after the Co-Lead Counsel and PSC structure was established, Co-Lead Counsel circulated to all Plaintiffs' counsel a written explanation of how they would be compensated should the case prove successful.  Plaintiffs' counsel were provided guidelines for what would be considered compensable time and told that lodestar would be the basis of any fee payment. Decl., ¶ 23.[6]  At various other points throughout the litigation, memoranda were circulated explaining that fees payable at the end of the case would be based upon audited lodestar.  For example, in a December 2005 memorandum, counsel were reminded of the importance of maintaining their daily time records so the compensable tasks of each firm could be determined.  Likewise, in 2010, a letter was sent to counsel reminding them that any future payment of fees would be based upon lodestar and asking them to provide daily time records.  *Id.*

In April 2016, in preparation for preliminary approval of the settlements, the Co-Lead Counsel solicited updated contemporaneous time and billing records from all participating firms. In this letter, each individual counsel was told what records they were missing and given the opportunity to submit their complete daily time records to support their lodestar and the allocation of fees. *Id.*

In addition to written representations about lodestar serving as the basis for future fee payments, at every one of the quarterly meetings held between 2005 and 2010, which were attended by most of the local counsel, the subject of attorney's fees was raised.  In these meetings, Co-Lead Counsel reiterated that compensation at the end of the cases, if any, would be distributed based on lodestar for authorized work.  Decl., ¶ 24.

---

[6] The letter and other specific memoranda discussed herein are not provided as exhibits to the Allocation Report to prevent any inadvertent waiver of privilege.  Co-Lead Counsel will provide such documents for in-camera inspection should the Court wish to review them.

On August 23, 2016, Co-Lead Counsel sent a letter to all counsel that described in detail the fee allocation framework now before the Court for approval. Decl., ¶ 25; Ex. 4. Co-Lead Counsel stated that a Proposed Allocation for each firm would be preliminarily determined after review and audit of the billing records according to the guidelines in the October 2005 instructional memorandum and otherwise provided throughout the pendency of MDL No. 1700. After the audit, firms would be notified and provided the opportunity to discuss the Proposed Allocation with the Co-Lead Counsel and the Steering Committee before the submission of a final recommendation to the Court.  The August 2016 letter again directed firms who had not already submitted daily time records to do so and asked that all counsel provide the records in the form of an Excel spreadsheet.  *Id.*

As described below, Co-Lead Counsel's Proposed Allocation is consistent with the representations Co-Lead Counsel has made to Plaintiffs' attorneys since the beginning of this case.  Those attorneys who chose to devote substantial time and resources throughout the long duration of this case – at significant risk of nonpayment – relied on the representations of how counsel would be compensated based on lodestar for assigned and approved work in the event of a successful outcome.   The Proposed Allocation is also consistent with the numerous communications to Plaintiffs' counsel regarding billing records, compensable time, and the obligation to submit such records in order to receive compensation at the end of the case.

## III.    THE FEE ALLOCATION PROCESS

### A.    The Allocation Components

The Proposed Allocation is grounded in the allocation framework the Co-Lead Counsel described to all Plaintiffs' counsel in their August 23, 2016 letter (Ex. 4), and to this Court at the March 13, 2017 final approval hearing as well as hearings held on August 10, 2016 (Barton Motion to Compel) and January 27, 2017 (Organizational Meeting and CMC).  Ex. 5.  It has

three components: (1) expense reimbursement; (2) origination; and (3) relative contribution, measured by each firms' *pro rata* share of the aggregated audited lodestar for authorized work performed for the benefit of the cases collected in the MDL docket.

*Expense Reimbursement*: the vast majority of the expenses incurred by the MDL counsel were reimbursed in 2012 by the Co-Lead Counsel using funds returned to the MDL litigation fund from cases that were remanded out of the MDL docket and settled in their home jurisdictions. The remaining $462,972.74 in authorized but unreimbursed litigation expenses incurred by participating firms will first be reimbursed from the aggregated fees awarded in the 19 cases before fees are distributed. These include primarily assessments to the litigation fund that have not been reimbursed as well as travel expenses incurred in connection with the mediations. *See* Decl., ¶ 32 and Ex. 3. [7]

*Origination*: a flat 15% from the fees awarded in each case will be paid to the initiating law firm(s) (after deducting expenses as described above). In cases initiated by multiple firms, the Co-Lead Counsel will remit the 15% origination payment per instructions from the originating firms based on their internal agreements. The decision to include a 15% origination component was made by the Co-Lead Counsel and the PSC after much deliberation because "origination" is not a normal component of fee allocation in an MDL case. Nonetheless, the Co-Lead Counsel and the PSC concluded it would be appropriate to include such a component in the allocation formula in these cases to recognize the value added to the "critical mass" of cases that ultimately produced the twenty settlements because, unlike most MDL cases, the claims asserted and available remedies in each case, while similar, were not identical. The percentage was set at

---

[7]   In the absence of a common benefit set aside order, the Co-Lead counsel made efforts to collect a share of fees recovered through settlements in remanded cases (and were largely but not completely successful) for distribution to the firms that paid assessments and incurred other costs to fund the MDL litigation as a whole.

15% to avoid creating a windfall to firms that contributed little in the way of time or money to the consolidated litigation after transfer into the MDL. The 15% strikes an appropriate balance by leaving sufficient funds in the aggregate to pay fair compensation to the firms that invested substantial time and resources doing substantive work for the benefit of the group of cases with no guarantee of compensation based on the expectation that they would be compensated from fees recovered, if any, based on that work. Decl., ¶ 33.

*Pro Rata Distribution:* after expenses and the origination percentage are deducted, the remainder of the attorney's fees awarded in each case will be aggregated and distributed to the 36 participating firms based on their respective *pro rata* shares of the total audited MDL lodestar for legal work assigned by Co-Lead Counsel and appropriately recorded pursuant to the time-keeping guidelines. To arrive at each participating firms' *pro rata* share of the aggregated MDL lodestar, Co-Lead Counsel and the PSC divided each firms' audited lodestar by the audited lodestar of all participating firms. Attached as Exhibit 1 is a spreadsheet showing each firm's audited lodestar and the *pro rata* percentage that firm will receive from the funds available to distribute (net expenses and origination fee). Decl., ¶ 34.

The Co-Lead Counsel and the PSC further determined that – consistent with the expectations laid down by Co-Lead Counsel throughout the litigation - using each firm's audited lodestar as the measure of its relative contribution to the MDL is the most fair and reasonable way to allocate the fees awarded in all cases. While each case in the MDL docket retained its separate identity and was litigated before this Court on its own merits at every stage, the work assigned focused largely on developing the common facts bearing on the drivers' employment status that was done for the benefit of all cases. And, even with respect to the state specific work, many of the participating attorneys were assigned work on cases other than those

originated by their own firms. Allocation of fees in *pro rata* shares based on relative lodestar aligns with the reasonable expectations of all counsel both because of what they were told, and because of how the work was assigned and performed.  Decl., ¶ 35.

B.      **The Audit Process**

The time and billing records submitted by each firm (including those of the Co-Lead and PSC firms) were reviewed at least twice, by different Co-Lead Counsel and PSC members, and then analyzed and discussed by the PSC as a group, to ensure that the audit standards were applied consistently and with as much uniformity as possible to each firm.  Because each of the reviewers were deeply involved in all active phases of the litigation and were intimately familiar with the work assigned to and performed by the participating firms, they were uniquely situated to assess whether the work described in the participating firms' billing records was authorized and otherwise conformed to the billing guidelines communicated from the inception of the case. Decl., ¶ 36.

The reviewers allowed time documented in the records for: (1) tasks necessary to initiate each case before transfer to the MDL docket was included (e.g. client retention, preliminary fact investigation, development of legal theories, pleadings); (2) client contact during all phases of the case; (3) quarterly meetings of counsel; (4) tasks assigned by Co-Lead Counsel (*e.g.* committee work, responding to written discovery and production requests, depositions, brief-writing, etc.); (5) an appropriate and reasonable "read and review" of filings and court orders by the primary counsel of a firm during the active phases of the litigation; and (6) participation in the settlement process.  Decl., ¶ 37.  Although not typically allowed, and in addition to the origination fee described above, Co-Lead Counsel and the PSC allowed firms to include pre-MDL time spent investigating and developing the case and retaining clients.  *Id.* ¶ 38.

Reviewers excluded time documented in the records for (1) clerical and administrative work, including time and expense reporting, unless assigned by Co-Lead Counsel; (2) self-initiated legal research, pleadings and motion practice and fact investigation not assigned by Co-Lead Counsel; (3) self-initiated legal research, pleadings and motion practice, and fact investigation pertaining to cases not pending in the MDL unless assigned by Co-Lead Counsel; (4) rote and block billing; (5) excessive internal conferences; and (6) excessive read-and-review time entries.  Reviewers also excluded time entries that did not adequately describe the nature of the service performed, along with duplicate and non-contemporaneous time entries. Decl., ¶ 39.

As noted above, the overarching goal of the Co-Lead Counsel and PSC was to compensate firms for authorized work over the last 12 years using each firm's audited lodestar as the measure of its relative contribution. To calculate the audited time for the non-PSC firms, Co-Lead Counsel and the PSC multiplied the audited hours for each firm's time-keepers by the firm's self-reported 2016 hourly billing rates.[8]  For the Co-Lead and PSC firms, the audited lodestar was calculated using each firms' 2014-2015 billing rates with modest adjustments for some (but not all) time-keepers to bring those rates current to 2016.  Decl., ¶ 40.

On June 9, 2017, Co-Lead Counsel and the PSC communicated a Proposed Allocation to each of the 36 participating firms based on the results of the audit.  Each firm received a letter that fully described audit standards and process, along with a summary of the Committee's audit of their time (including the hours submitted, the hours disallowed, the percentage of time disallowed, and the reasons for that time being excluded); a spreadsheet showing the total audited lodestar, the amount of the expenses to be reimbursed, the amounts to be distributed

---

[8] For a small number of firms that did not report time using their 2016 billing rates, billing rates were assigned either using declarations those firms had submitted to a court containing their rates, or from the commercially available RealRate© Survey for the applicable geographic market.

from the settled cases, each firm's pro rata share of the audited lodestar, and each firm's total allocation from this first distribution; a spreadsheet showing the origination fee amount for each of the settled cases.  Decl., ¶ 30.

All counsel were asked to either accept the Proposed Allocation, or to state their objections to it, in writing by June 16, 2017.  The Co-Lead Counsel committed to consider and discuss all objections raised and to make any needed corrections and adjustments before submitting its report and recommendations to the Court. The Co-Lead Counsel spent several weeks conferring with the local counsel and made corrections and adjustments to the Proposed Allocations of a number of firms that stated concerns and objections as requested. Decl., ¶ 41.

As of this filing, 29 of the 37 firms have accepted the PSC Allocation.  The firms that have not accepted the allocation include three firms that, along with several non-objecting firms, originated the cases in North Carolina, South Carolina and Georgia (Whetstone, Perkins & Fulda, LLC, R. James Lore, and Gorby Peters Law), one firm that, with several non-objecting firms originated cases in Rhode Island and Maryland (Law Offices of Peter N. Wasylyk) and originating counsel in cases filed in Kansas (Law Offices of George A. Barton, PC), Louisiana (Frischhertz Pouillard Frischhertz & Impastato, LLC), Texas (Taylor Dunham, LLP), and West Virginia (Mani Ellis & Layne P.L.L.C.).[9]  Decl., ¶ 42.

---

[9] Several of these firms have indicated they intend to file motions with the Court objecting to the allocation framework and possibly for appointment of a special master. Co-Lead Counsel do not believe there is any valid basis for appointment of a special master but will respond to any such motions if and when they are filed.

## IV.     LEGAL ARGUMENT

### A.     Co-Lead Counsel And The PSC Are Best Positioned To Determine Firm Contributions And Substantial Deference Should Be Given To Their Allocation Of Attorney's Fees.

Attorney fee allocation is an "unenviable task" for anyone, particularly in complex litigation. *In re Copley Pharm., Inc.*, 50 F. Supp. 2d 1141, 1148 (D. Wyo. 1999). "District courts routinely give lead counsel the initial responsibility of devising a fee allocation proposal 'as they deem appropriate, based on their assessments of class counsel's relative contributions.'" *In re Initial Public Offering Securities Litig.*, No. 21 MC 92 (SAS), 2011 WL 2732563, at *7 (S.D.N.Y. July 8, 2011) (quoting *In re Vitamin Antitrust Litig.*, 398 F.Supp.2d 209, 224 (D.D.C. 2005)). The rationale for this policy is logical and practical: "by working together and communicating daily, often from the case's inception, class counsel is best positioned to determine the `weight and merit of each other's contributions.'" *In re Copley Pharm. Inc.*, 50 F.Supp.2d at 1148; *In re IPO Securities Litig., supra*, at *7 and n.36; *In re Indigo Sec. Litig.*, 995 F. Supp. 233, 235 (D. Mass. 1998) (same); *see also Turner v. Murphy Oil USA, Inc*., 582 F.Supp.2d 797, 808 (E.D. La. 2008) and *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 223 (2d Cir. 1987) (counsel are better able to decide weight and merit of colleagues' contributions).

For the same reason, district courts typically accord great weight to lead counsels' recommendations, if fair and reasonable, in exercising the court's ultimate discretion to allocate an aggregate fee among participating counsel in a class action MDL. *See, e.g. In re Copley Pharm., Inc., supra,* 50 F. Supp. 2d at 1149 (granting substantial deference to lead counsel's allocation because, lead counsel, "like the Court as the presiding jurist, was in a unique position to weigh the contributions to the litigation."); *accord In re IPO Securities Litig., supra,* at *7 (according "substantial deference" to fair and reasonable recommendations of lead counsel and

approving allocation of aggregate fee awards from 309 class cases to 59 participating law firms);

*In re Diet Drugs Prods. Liab. Litig.*, No. Civ.A. 99-20593, 2003 WL 21641958, at *6 (E.D. Pa.

May 15, 2003) (same; approving recommended allocation of interim class fee award); *accord In

re Volkswagen & Audi Warranty Extension Litig.*, 89 F. Supp. 3d 155, 179-180 (D. Mass. 2015);

*In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d at 225 (lead counsel allocation reviewed for

abuse of discretion and subject to reversal for clearly erroneous findings of fact or failure to

consider relevant factor).

> **B.    The Allocation Formula Produces a Fair Distribution of Fees to All
> Participating Firms With a Windfall to None Based on Each Firms Relative
> Contribution and Without Enhancements to the Co-Lead and PSC Firms.**

The starting point for a fair allocation of fees to participating firms in a class action MDL

is the relative contributions of each firm that led to the creation of the common settlement fund,

measured both in terms of "the quantity and quality of the effort expended by the attorneys in

obtaining the common fund." *In re Copley Pharm., Inc., supra,* 50 F. Supp. 2d at 1149.    In

*Turner v. Murphy Oil USA, Inc*., *supra*, the district court explained that a fair allocation of

common benefit fees to participating counsel in an MDL should be based on the three primary

factors that contribute to the successful resolution of any class action litigation beyond the law

and the facts: financial resources, the number of cases (or plaintiffs), and the work performed.

582 F. Supp. 2d at 808-810.

The most important of these factors, the court emphasized, is the attorney's labor.  *Id.*;

*see also In re Diet Drugs, supra*, 2003 WL 21641958, at *2-3 (relative contribution of each firm

to the overall outcome of the litigation - starting with each firms' reported lodestar followed by

adjustments to account for quality of work – was overarching consideration in allocating interim

fee award in class action MDL); *cf. In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 747-

48 (7th Cir. 2011) (Posner, J.) (observing allocation of fee between MDL lead counsel and other

class attorneys whose combined efforts produced final settlement using percentage instead of *relative lodestar* model unfairly penalized MDL leads who did 80% of the work).[10]

This Court previously acknowledged the concerns of Lead Counsel to "prevent unjust enrichment by attorneys free-riding off of the hard work of co-lead and MDL counsel." *See* MDL Doc. No. 2500 at 10-11 (citing *In re Nineteen Appeals*, 982 F.2d 603, 606 (1st Cir. 1992) for discussion of unjust enrichment of free-riders who have not shouldered the cost and risks of the litigation). While the Court declined to establish a common benefit fund when the cases were lost, noting that counsel are not guaranteed recovery irrespective of the result, the Court observed that "Co-Lead and MDL Counsel did a great deal of work, and should be compensated if that work leads to success." MDL Doc. No. 2500.

The Proposed Allocation in this case closely hews to the fee allocation protocols approved in the cited authorities, as well as this Court's prior order, and is fair and reasonable to all participating counsel. The components of the allocation formula (including payment of 15% of the fee awarded in each case to the originating counsel, and payment of the remainder in *pro rata* shares of the total audited lodestar of all firms) are grounded in entirely *objective* criteria that were applied uniformly across-the-board to all participating counsel, including the Co-Lead and PSC firms.

---

[10] By contrast, it is common for court appointed lead counsel in a **mass tort**-MDL to be awarded a "common benefit" fee that is a modest percentage of the individual plaintiffs' personal recoveries (or from a global settlement fund) in addition to the fee paid to their individually-retained counsel under contingency fee contracts. *See generally In re Vioxx Prod. Liab. Litig,* 760 F. Supp. 2d 640, 652-654 (E.D. La. 2010). The mass-tort cases are inapposite: unlike "the paradigmatic common fund [MDL] case" like the ones at bar, in which the court appointed "class counsel do virtually all the work, and other counsel piggyback on their efforts," individually-retained attorneys in a mass tort MDL perform *substantial* services and do not "merely go along for a free ride to earn their keep." *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.,* 56 F.3d 295, 310 (1st Cir. 1995).

It bears emphasis that district courts *routinely* approve enhancements for Co-Lead and PSC firms in MDL proceedings to recognize the greater financial risks assumed, particularly at the end of a protracted litigation like this one.   *See, e.g. In re Vitamins Antitrust Litig*., 398 F. Supp. 2d at 233-34 (explaining that lodestar methodology with consistent multipliers ranging between 2.25 and 3.75 for lead counsel across organizational tiers "was the fairest compensation scheme because it was based on the expectation the lawyers had as to how their compensation would be determined."); *In re IPO Securities Litig., supra*, at *10 (finding that lodestar multiplier of 2.5 for lead counsel after 8 year litigation was "well within the range of enhancements repeatedly approved by district courts"); *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 85-86, 90 (2d Cir. 2010) (district court did not abuse discretion in approving allocation awarding lodestar multiplier of 2.89 to lead counsel and lodestar fee with no multiplier to non-lead counsel).

It is equally common for district courts to approve enhancements designed to provide greater compensation to the lead counsel and others who performed the more significant types of work that ultimately produced a successful result. *See e.g. Turner v. Murphy Oil, supra,* 582 F. Supp. 2d at 810-11 (observing that "not all types of work are created equal" and approving lodestar-based allocation that assigned greater weight to time spent on more significant tasks such as depositions, brief writing, formulating strategy and tactics than time spent on client contact, document review and litigation monitoring).  *Cf. In re Copley Pharm., Inc.,* 50 F. Supp. 2d at 1153-56 (amount of fees allocated to participating firms based, in part, on type and significance of work performed).

An allocation providing either a risk enhancement to Lead Counsel or calculated using weighted, or tiered, hours based on the type of work performed, or both, would be fully justified

in this case:  the Co-Lead and PSC firms shouldered fully 75% of the litigation costs and performed no less than 80% of the substantive work during the MDL over a dozen years (including assuming all of the risk during the six years after the cases had been lost) that precluded them from taking on other fee generating work.  By contrast, fewer than half of the local firms participated in the litigation beyond communicating with the class representatives to facilitate their participation in the discovery and settlement processes, and generally staying abreast of litigation developments.

Nonetheless, the Proposed Allocation provides *no enhancement* or other component for risk to the six Co-Lead Counsel and PSC firms.  Instead, the Proposed Allocation remains true to the expectations communicated by the Co-Lead Counsel from the inception of the litigation that compensation would be paid to those counsel who performed assigned, compensable work, using lodestar as the measure of each firm's relative contribution to the MDL effort as a whole. *Compare In re Vitamins Antitrust Litig.*, *supra,* 398 F. Supp. 2d at 233-234 (it was abuse of discretion when lead counsel "deviat[ed] from the initial rules of the game and justifiable expectation of the concerned firms" without justification in allocating aggregated pool of fees between Plaintiffs' counsel).

Further, while there is no precedent for paying extra compensation to originating counsel in a class action MDL simply because they filed a lawsuit, the 15% origination component of this Proposed Allocation guarantees a fee recovery for originating counsel in every state – whether or not they contributed time and resources to the litigation.[11]  In *Turner v. Murphy Oil*

---

[11]  Courts uniformly reject the notion that counsel are entitled to fees simply because they filed a lawsuit; instead, there must be some indication that the originating counsel conferred a tangible benefit to the class.  *Cf. Victor*, 623 F.3d at 86; *In re Nigeria Charter Flights Litig.*, Nos. 04-304, 04-1613, 2011 WL 7945548, at *10 (S.D.N.Y. Aug. 25, 2011); *In re Tut Sys., Inc. Secs. Litig.*,

*USA, Inc., supra*, the district court recognized that the number of cases filed is a factor to consider in fee allocation, in addition to financial resources contributed and attorney labor, but one which should not be overemphasized so as to prevent attorneys from being "misled into thinking that they can simply produce cases, and do little or no work and reap huge financial rewards, a certain recipe for disaster for the litigants, the attorneys, and the legal profession." 582 F. Supp. 2d at 809. The 15% origination payment guarantees a modest fee recovery to those firms that contributed to the "critical mass" in proportion to the value of the unique state law claims in each case, without creating a windfall to those who contributed relatively little or no time or money after transfer of their cases to the MDL docket.

Last, the allocation process ensures that all firms with an interest in payment of fees from the Settled Cases would have a full and fair opportunity to have any objections considered and resolved by Co-Lead Counsel and the PSC or, failing that, this Court. Each firm was provided with written notice of its Proposed Allocation on or about June 9, 2017 along with a complete description of the allocation formula and the audit standards applied. Each firm was also provided with a worksheet showing the allowed and disallowed time in its time-records, the hourly billing rates use to compute its audited lodestar (which, with just a few exceptions, are the firm's own reported billing rates for 2016) and a chart showing the audited lodestar of all other participating firms. All firms were asked to state their questions, concerns and objections (if any) to any aspect of the Proposed Allocation in writing and to discuss the same with the Co-Lead Counsel with the goal of resolving any disputes without the need for court intervention. And, in fact, adjustments were made to the Proposed Allocations for a number of firms that raised legitimate issues concerning certain hours that were disallowed and the billing rates used

---

No. 01-2659, 2007 WL 1722420, at *3 (N.D. Cal. June 13, 2007) (rejecting fees for attorney who "merely . . . referr[ed] clients").

to calculate the lodestar fee.  Most of the objecting firms raised objections not to the audit of their time records or the standards applied, but instead to the 15% origination fee along with general complaints (without a corresponding specific dispute as to their audited hours) that they were not getting enough money.

## V.       INDIVIDUAL FIRM ALLOCATIONS

Since 2005, the Co-Lead Counsel and the PSC were appointed by the Court and charged with the responsibility of overall management and coordination of the 42 putative class actions that were filed in 38 states on behalf of more than 20,000 FXG pickup and delivery drivers, along with several dozen non-class cases that were tagged-along into the MDL docket between 2005 and 2010.  Co-Lead Counsel were certified by the Court as the sole Class Counsel representing the classes of FXG drivers in the 26 cases that were ultimately certified for class-wide adjudication and continued to serve in that role for the duration of the litigation.

Co-Lead Counsel were ultimately responsible for overall case management, as well as formulating the strategy and tactics to guide each major stage of the litigation, including fact and expert discovery, class certification, summary judgment, appeals, mediation and settlement.  The Co-Leads together chaired the approximately 10 quarterly meetings of Plaintiffs' counsel, and assigned and supervised all legal work assigned to the non-lead attorneys to prosecute the consolidated cases.

The Co-Lead Counsel and the PSC, have been intimately involved in all aspects of the litigation and have first-hand knowledge of the work assigned and performed by counsel in these cases, the quality of the work, and the contributions of all Plaintiffs' counsel to the successful final outcome obtained. Co-Lead Counsel have taken the leading role in performing and coordinating all manner of tasks related to this matter at each phase of the litigation, and have supervised and directed the work performed by the all other counsel to ensure that the work

performed was productive and carried out efficiently.  The following is a summary of the work assigned to each firm, as well as their audited lodestar and Proposed Allocation.

## LEONARD CARDER, LLP

Leonard Carder, LLP is one of the three Court-appointed Co-Lead Counsel.  Leonard Carder litigated and prevailed in *Estrada v. FedEx Ground,* the California class action that was the predecessor to, and impetus for, the filing of the state law class actions filed across the country that were transferred into this MDL docket.  Lynn Faris of Leonard Carder appeared at and opposed both motions filed by FXG for coordination with the JPML.  She was thereafter appointed by the Court as one of the three Co-Lead counsel based on Leonard Carder's expertise in complex employment law litigation – including the *Estrada* case which was tried to judgment – and Leonard Carder's willingness and ability to fund the MDL litigation.

More particularly, Lynn Faris was the designated point of contact with FXG's lead trial counsel and participated extensively in meetings and with him and other FXG counsel regarding case management and administrative issues throughout the litigation. Leonard Carder assumed overall responsibility for producing the initial disclosures in each case, and for devising the affirmative discovery strategy and coordinating all aspects of the affirmative written discovery and production requests propounded to FXG, as well as the affirmative deposition strategy. Leonard Carder personnel took close to half of the 105 depositions of FXG directors, executives and managers, as well as numerous 30(b)(6), non-party witness and assisted in preparing for key depositions taken by others. Leonard Carder was the point of contact with various state attorneys generals and the IRS in connection with parallel investigations of the independent contractor classification of the FXG pickup and delivery drivers represented in these cases.

Leonard Carder also chaired the summary judgment committee, which included, *inter alia,* formulating the summary judgment strategy; drafting both the omnibus fact and legal briefs and templated briefs that were filed in connection with the parties 42 separate cross-motions for summary judgment/adjudication;  filing and responding to multiple procedural motions presented to the Court in connection with the same, assigning and supervising  work of others in preparation of the state specific briefs.  Leonard Carder co-chaired the expert witness committee with LGN, including formulating the expert witness strategy, identifying and engaging affirmative experts, working with the designated experts to develop their testimony, and defending their depositions, as well as deposing FXG's multiple experts and filing *Daubert* motions.  Leonard Carder attorneys also actively participated in the class certification committee, including formulation of strategy and tactics, contributing to the omnibus briefing, research and preparation of numerous state specific filings, and coordinating the preparation and filing of many dozens of supporting class member declarations.   Leonard Carder personnel handled dozens of discovery disputes, briefed dozens non-dispositive, collateral and discovery motions, and oversaw various other discovery and document review projects and actively participated in review and coding of FXG's massive document production.

After judgment was entered, Leonard Carder appeared as the counsel of record for the Plaintiffs in connection with the 20 cases appealed to the Seventh Circuit; the firm drafted the appellate briefs filed with the Seventh Circuit and argued the *Craig* appeal; drafted the briefs filed with the Kansas Supreme Court on the certified questions tendered by the Seventh Circuit and assisted in preparing for argument before the Kansas Supreme Court.

The three Co-Lead firms together were the architects of the Plaintiffs' mediation and settlement strategy.  They worked with Plaintiffs' expert to analyze substantial, complex data to

model the damages appropriate to the varying remedial schemes in each case; they researched and drafted substantive mediation statements for each case, prepared for and mediated the 20 mediations in all settled cases; negotiated the settlement agreements; oversaw the settlement administration, including working with the administrator to update the websites and contact class members; and briefed the preliminary and final approval motions, and motion for attorney's fees, prepared the substantive briefing in response to the New Jersey objections, and other briefing in connection with the settlement approval.   Leonard Carder personnel have responded to hundreds of driver calls from all states throughout this litigation.

The firm submitted a total of 27,788 hours and $17,245,904 in lodestar, advanced $748,917 to fund the costs of the litigation including $427,500 paid to the litigation fund for shared expenses, and $321,417 in firm expenses.  Leonard Carder has been reimbursed $717,110 for expenses (assessments and held expenses), with a balance outstanding of $31,807.

Leonard Carder, along with the other Co-Lead firms, self-audited its time and expense records in 2015 and in the exercise of reasonable billing judgment, removed several hundred entries that could not reasonably be charged to a fee-paying client.  The firm's time records were audited again by the PSC.  And, based on that review, 524 hours were disallowed, resulting in an audited lodestar of $17,074,791.50, representing 24.292% of the total audited lodestar of all firms.  This *pro rata* percentage yields a distribution of $13,371,106.50 plus reimbursement of expenses in the amount of $31,807 from the fees awarded in the 19 settlements.

### LOCKRIDGE GRINDAL NAUEN P.L.L.P.

Lockridge Grindal Nauen P.L.L.P. (LGN) is one of the three Court-appointed Co-Lead Counsel.  Following coordination of these cases into the MDL proceeding, Susan Ellingstad of LGN was appointed by the Court to one of the three leadership roles in the case based on LGN's

decades of experience in litigating complex MDL class actions and employment law cases, and LGN's willingness and ability to fund the MDL litigation.

LGN chaired the pleadings committee, which coordinated the research and analysis of the legal claims asserted in all of the cases transferred into the MDL, researched viable legal theories, and amended the complaints in all of the coordinated cases – and the class certification committee, including formulating the overall class certification strategy, drafting the assembled factual record in support of class certification for all coordinated cases and preparing the omnibus fact and legal briefs, and template briefing, to support certification of claims in each putative class action; assigning and  supervising work performed by others in connection with the 42 motions; and briefing Plaintiffs' opposition to the Rule 23(f) appeal pursued by FXG to the Seventh Circuit.

LGN co-chaired the expert witness committee, including formulating the expert witness strategy, identifying and engaging affirmative experts, working with the designated experts to develop their testimony, and defending their depositions, as well as deposing FXG's multiple experts and filing *Daubert* motions.  LGN attorneys also actively participated in formulating the affirmative discovery strategy, and deposed approximately a dozen key FXG executives and managers.  LGN was an equally active participant in the summary judgment committee, including formulation of strategy and tactics, preparation of the template briefs that formed the basis for the state specific briefs filed in connection with the 42 separate cross-motions for summary judgment, and research and preparation of numerous state specific filings.  LGN was also responsible for coordinating and facilitating the production of documents by the 215 class representatives in response to FXG's production requests, and with creating, maintaining and coordinating the use by all counsel of the centralized document depository that was established

to house all discovery produced in the cases – including the 3 million documents produced by FXG and the documents produced by Plaintiffs.  LGN participated extensively in meet and confers with FXG over a wide variety of issues in the litigation, and prepared deposition packets for all Plaintiffs prior to their depositions.

LGN also briefed dozens of non-dispositive motions, including compelling the IRS Notice of Proposed Action (NOPA); supervised and staffed the document coding project, and oversaw the various discovery and document review projects.  The firm assisted in the briefing of the appellate briefs to the Seventh Circuit and Kansas Supreme Court, assisted in the preparation for oral argument before both appellate courts, and was the primary author of the Rule 52 briefs filed at the Court's request.

The Co-Leads together were the architects of the plaintiffs' mediation and settlement strategy.  They worked with Plaintiffs' expert to analyze substantial, complex data to model the damages appropriate to the varying remedial schemes in each case; they researched and drafted substantive mediation statements for each case, prepared for and mediated the 20 mediations in all settled cases; negotiated the settlement agreements; oversaw  and coordinated the settlement administration, including working with the administrator to update the websites and contact class members; and briefed the preliminary and final approval motions, and motion for attorney's fees, prepared the substantive briefing in response to the New Jersey objectors discovery motion, and other briefing in connection with the settlement approval.  LGN personnel have assembled case-specific documents for dozens of counsel, and have responded to hundreds of driver calls from all states throughout this litigation.

LGN submitted a total of 30,630 hours and $16,473,016 in lodestar and advanced a total of $884,112.37 to fund the costs of the litigation, including $432,500 paid to the litigation fund

for shared expenses, and $451,612 in firm expenses.  LGN was reimbursed $810,874 for expenses (common expenses and held expenses) leaving a balance of $73,237.

LGN, along with the other Co-Lead firms, self-audited its time and expense records in 2015 and in the exercise of reasonable billing judgment, removed several hundred entries that could not reasonably be charged to a fee-paying client.  The firm's time records were audited again by the PSC.  And, based on that review, 450 hours were disallowed, resulting in an audited lodestar of $16,238,721.25, representing 23.102% of the total audited lodestar of all firms.  This *pro rata* percentage yields a distribution of $12,716,387.85 plus reimbursement of expenses in the amount of $73,237 from the fees awarded in the 19 settlements exclusive of the origination fees.  LGN will receive some portion of the origination fees for the fees awarded in Arizona, Georgia, Indiana, Minnesota, Tennessee, Utah and Wisconsin cases.

### HARWOOD FEFFER LLP

Harwood Feffer is one of the three Court-appointed Co-Lead Counsel.  Following coordination of these cases into the MDL proceeding, Robert Harwood of Harwood Feffer was appointed to one of the three leadership roles in the case based on his and Harwood Feffer's decades of experience in litigating complex MDL class actions, including prior service as Co-Lead counsel in many other MDL cases, and the firm's willingness and ability to fund the MDL litigation.

Harwood Feffer was responsible for the overall administration and financial management of the MDL docket, including, *inter alia,* scheduling and collecting litigation assessments submitted by all firms, maintaining the books, records and accounts of the MDL, payment of expenses, as well as collection and monitoring of the monthly summary time and expense reports submitted by all counsel and the detailed contemporaneous time records.   It also headed the

strategy, briefing, and analysis of the nationwide ERISA claim, taking the lead in the settlement of that claim.  Harwood Feffer took the leading role in litigating the class notice issues with FXG and others, preparing the class notices and administering the notice and opt-out procedure, and co-chaired the deposition defense team with Jordan Lewis, including preparing for and defending numerous of the Named Plaintiffs' depositions throughout the country, and spearheading the terminal site visits. The firm actively participated in all substantive committee work, including pleadings committee - assisting with the research and analysis of viable legal theories and amendment of complaints as they were tagged-along into the MDL docket; affirmative document discovery and depositions, document review and analysis, and discovery motion practice; research and briefing of class certification and summary judgment motions, as well as the briefing of numerous non-dispositive motions.  The firm played a critical role during the appellate stage of the case, contributing to the briefing submitted to the Seventh Circuit and Kansas Supreme Court, and in the preparation for oral argument before both appellate courts.

The Co-Leads together were the architects of the plaintiffs' mediation and settlement strategy.  They worked with Plaintiffs' expert to analyze substantial, complex data to model the damages appropriate to the varying remedial schemes in each case; they researched and drafted substantive mediation statements for each case, prepared for and mediated the 20 mediations in all settled cases; negotiated the settlement agreements; oversaw  and coordinated the settlement administration, including working with the administrator to update the websites and contact class members; and briefed the preliminary and final approval motions, and motion for attorney's fees, prepared the substantive briefing in response to the New Jersey objectors discovery motion, and other briefing in connection with the settlement approval.    Harwood Feffer, like the other Co-Leads, has responded to hundreds of driver calls from all states throughout this litigation.

Harwood Feffer submitted a total of 23,396 hours and $14,208,140 in lodestar. It advanced a total of $877,241 to fund the costs of the litigation, including $435,000 paid to the litigation fund for shared expenses, and $442,241 in firm expenses. Harwood Feffer was reimbursed $809,585 for expenses (expenses and held expenses) leaving a balance of $67,655.

Harwood Feffer, along with the other Co-Lead firms, self-audited its time and expense records in 2015 and in the exercise of reasonable billing judgment, removed entries that could not reasonably be charged to a fee-paying client. The firm's time records were audited again by the PSC. And, based on that review, 2,148 hours were disallowed. Harwood Feffer's audited lodestar is $13,471,640, representing 19.166% of the total audited lodestar of all firms. This *pro rata* percentage yields a distribution of $10,549,512.90 plus reimbursement of expenses in the amount of $67,655 from the fees awarded in the 19 settlements, exclusive of the origination fee. Harwood Feffer will receive some portion of the origination fees for the fees awarded in the New York case.

### SIEGEL BRILL, P.A.

Jordan Lewis was a partner in the firm of Siegel Brill and was appointed to the Plaintiffs' Steering Committee appointed by Magistrate Judge Nuechterlein on November 15, 2005 (Doc. No. 52). Together with Harwood Feffer, Mr. Lewis coordinated the defense of the 215 Named Plaintiffs' depositions across the 42 cases, and supervised a team of approximately 6 other participating attorneys who volunteered to assist with this project. Mr. Lewis and the deposition defense team prepared a coordinated strategy for the defense and redirect examinations of these depositions and then took the lead in preparing the witnesses and defending these depositions, assisted in most (but not all) cases by local counsel. Siegel Brill personnel also participated in the pleadings committee, assisted the Co-Lead counsel LGN in preparing deposition kits for the

preparation of the Named Plaintiffs, were involved in document review and coding, and assisted with some state specific research and document review for the class certification motions.  As a member of the PSC, Jordan Lewis attended all PSC and Quarterly meetings of counsel.

The firm submitted a total of 3,434.68 hours and $1,647,308.00 in lodestar.  It advanced a total of $310,611 to fund the litigation costs, including $225,000.00 to the litigation fund for shared expenses and $85,611 in firm expenses.  Siegel Brill was reimbursed $310,561 for expenses in leaving a balance of $49.50.  Based on a complete review of the time and expense records, Siegel Brill's audited lodestar is $1,507,172.25, which is 2.144% of the total audited lodestar of all firms.  This pro rata percentage yields a distribution of $1,180,252.23 plus reimbursement of expenses in the amount of $49.50 from the fees awarded in the 19 settlements exclusive of the origination fee.  Siegel Brill will receive some portion of the origination fees for the fees awarded in Maryland, North Carolina, Rhode Island, South Carolina, and Wisconsin.

### CURETON CAPLAN AND MARCHETTI LAW, P.C.

Jerry Cureton of Cureton Caplan was a member of the Plaintiffs' Steering Committee appointed by Magistrate Judge Nuechterlein on November 15, 2005 (Doc. No. 52).   Anthony Marchetti was a partner with Cureton Caplan until Mr. Cureton retired and the firm dissolved in 2010, at which time he assumed Mr. Cureton's role as PSC member in his successor law firm, Marchetti Law, P.C.  Cureton Caplan was also the originating counsel in the New Jersey case, was one of several originating counsel in the Louisiana and North Carolina cases.   Jerry Cureton was an active participant in the affirmative discovery effort.  He worked closely with Leonard Carder and Lynn Faris in formulating the affirmative discovery plan – including identifying key deponents and areas of inquiry, and deposing more than 30 of FXG's key executives and management personnel.  Mr. Cureton was an active participant on the class certification and

expert witness committees, researched and drafted numerous discovery and class certification motions.   Mr. Marchetti co-led the deposition defense team, along with Harwood Feffer and Siegel Brill; he worked with local counsel to schedule, prepare and defend the depositions of 45 Named Plaintiffs throughout the country.   Cureton Caplan played a leadership role in class member communication and outreach, participated in expert discovery, and maintaining and updating the Plaintiffs' website relating to the litigation in all of the coordinated state cases. Cureton Caplan personnel also actively participated in document review and coding.   Mr. Cureton and Mr. Marchetti attended all quarterly meetings of the PSC and of Plaintiffs' counsel.

Cureton Caplan submitted a total of 10,598.90 hours and $5,136,370.50 in lodestar. Marchetti Law submitted a total of 1,192.95 hours and $824,615 in lodestar.   The two firms advanced approximately $517,578 to fund the costs of the litigation, including a combined total contribution of $233,500 toward the litigation fund for shared expenses and $284,078 in firm expense.   Cureton Caplan and Marchetti were reimbursed a total of $508,311.87 for expenses, leaving a balance of $9,266.   Based on a complete review of the time and expense records, the audited lodestar for Cureton Caplan is $4,677,520.50, representing 6.655% of the total audited lodestar for all firms.   The audited lodestar for Marchetti Law is $755,015, representing 1.074% of the total audited lodestar for all firms.   This *pro rata* percentage yields a distribution of $3,662,921.73 for Cureton Caplan and $591,245.05 for Marchetti Law plus reimbursement of expenses in the amount of $9,266.59 from the fees awarded in the 19 settlements, exclusive of the origination fee.   Marchetti Law will also receive a portion of origination fees for the Louisiana and North Carolina settlements.   Once the New Jersey settlement is resolved, Marchetti Law will receive an origination fee for the New Jersey settlement.

## ZIMMERMAN REED, P.L.L.P.

J. Gordon Rudd, Jr. of Zimmerman Reed is a member of the Plaintiffs' Steering Committee appointed by Magistrate Judge Nuechterlein on November 15, 2005 (Doc. No. 52). Zimmerman Reed attorneys played a substantial role in many substantive aspects of the litigation. They assisted in the preparation and defense of several Plaintiffs' depositions and a 30(b)(6) deposition of FXG; participated in the pleadings committee, researching state law claims and legal theories; substantially contributed to the coding and document review projects; assisted in drafting several non-dispositive motions; served as a lead firm in the research and briefing of 42 state class certification and summary adjudication motions; actively participated in developing the testimony of several expert witnesses and their reports and in briefing of *Daubert* motions, responses, and oral argument; assisted in the content and development of the drivers' website and communications outreach; participated in mediations for a number of states; and assisted in drafting settlement approval motions. Mr. Rudd attended all of the quarterly PSC meetings and Quarterly meetings of Plaintiffs' counsel.

Zimmerman Reed submitted a total of 9,902.80 hours and $4,884,352.75 in lodestar. It advanced a total of $365,674 to fund the litigation costs, including $230,000 to the litigation fund for shared expenses, and $135,674 in firm expenses. Zimmerman Reed was reimbursed $346,816 for expenses (expenses and held expenses) leaving a balance of $18,858.67. Based on a complete review of the time and expense records, Zimmerman Reed's audited lodestar is $4,726,664.50, which is 6.724% of the total audited lodestar of Plaintiffs' counsel. This *pro rata* percentage yields a distribution of $3,701,405.92 plus reimbursement of expenses in the amount of $18,858 from the fees awarded in the 19 settlements, exclusive of the origination fee. Zimmerman Reed will also receive some portion of the origination fees out of the fees awarded in the Arizona, Georgia, Indiana, Minnesota, Tennessee, Utah and Wisconsin cases.

## ANDERSON, AGOSTINO & KELLER, P.C.

Anderson Agostino was engaged to serve as local counsel following the retirement of John Hamilton who initially served as local counsel.  Early in the case, the firm reviewed and assisted with a number of filings with the Court.  Thereafter, the Co-Leads assumed the filings on ECF and the firm was assigned no further work.  Anderson Agostino submitted a total of 124.55 hours and $24,910 in lodestar.  The made no contributions to the litigation fund.  Based on a complete review of the time and expense records, the audited lodestar for the firm is $24,910, which is 0.035% of the total audited lodestar of all firms.  This yields an allocation of $19,506.78 of the fees awarded in the 19 settlements.

## BARKAN MEIZLISH, LLP

Barkan Meizlish is one several local and originating counsel in the Ohio *Kelly* case. Personnel from Barkan Meizlish participated in responding to written discovery propounded to the Ohio Named Plaintiffs and defending their depositions.  In addition, Barkan Meizlish personnel were assigned the work of deposing several FXG Ohio regional managers and one 30(b)(6) witness.  They also were assigned a number of document coding and review projects. The firm was instrumental in investigating and filing of two opt-in FLSA cases (*Givens* and *Vargas*) on behalf of small truck delivery drivers in 2008.  The firm's lawyers defended the Named Plaintiffs' depositions and played a leading role preparing motions and briefing for conditional class certification in those cases.  Apart from work assigned by lead counsel, the firm kept class representatives apprised of the status of the litigation, participated in the mediation and settlement, communicated settlement information to class members, responded to class member inquiries, and attended the quarterly meetings of Plaintiffs' counsel.

The firm submitted a total of 1,771.49 hours, $817,036.65 in lodestar and contributed $40,562 to the litigation.  The firm was reimbursed for expenses totaling $37,867 in December

2012 leaving a balance of $2,694.  Based on a complete review of the time and expense records, the audited lodestar is $671,219.60 which is 0.955% of the total audited lodestar of all firms. The pro rata percentage results in an allocation of $525,625.67 of the attorney's fees awarded in the 19 settlements exclusive of origination and $2,694.79 for reimbursement of expenses.  The firm will receive an origination fee from the attorney's fees awarded in the Ohio settlement.

### BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, PC

Beasley Allen is co-counsel in the Alabama *Gentle* case.  Personnel of the firm assisted in the preparation and defense of the three Named Plaintiffs' depositions.  The firm was not assigned additional work and its role was primarily to keep class representatives apprised of the status of the litigation.  Beasley Allen submitted a total of 51.81 hours, $12,459.50 in lodestar and contributed $10,000 to the litigation fund for shared expenses and $6,411 for firm expenses. The firm was reimbursed for expenses totaling $10,000 leaving a balance of $6,411.  Based on a complete review of the time and expense records, the audited lodestar is $7,761.50, representing 0.011% of the total audited lodestar.  This yields an allocation of $6,077.96 of the fees awarded in the 19 settlements exclusive of origination and $6,411.56 in reimbursement of expenses. Beasley Allen will receive some portion of the origination fee from the attorney's fees awarded in the Alabama settlement.

### CARLSON LYNCH SWEET & KILPELA

Carlson Lynch filed the *Hart* class action in Pennsylvania in 2005.  A Pennsylvania class was certified in the companion *Willis* action.  Carlson Lynch assisted in responding to the discovery served on Plaintiff Hart and in preparing and defending Hart's deposition.  The firm did not participate in any other committees and was assigned no additional work; its role was primarily to keep class representatives apprised of the status of the litigation.  Personnel from the firm attended several quarterly meetings of Plaintiffs' counsel.  The firm submitted a total of

380.10 hours, $221,486.50 in lodestar and did not contribute to the litigation fund for shared expenses.  Based on a complete review of the time and expense records, Co-Lead Counsel recommends an allocation of $204,305.50 which is 0.291% of the total audited lodestar of all firms.  This yields an allocation of $159,989.69 of the fees awarded in the 19 settlements exclusive of origination and $7,468.43 in reimbursement of expenses.  Carlson Lynch will receive some portion of the origination fee from the attorney's fees awarded in the Pennsylvania settlement.

### FAGAN MCMANUS, P.C.

Fagan McManus, P.C. was co-counsel in the remanded Michigan action.  Fagan McManus volunteered and was assigned to perform substantial work on document review and coding, and to prepare a comprehensive analysis of FXG's management and driver training materials in connection with the affirmative depositions on those subjects.  The firm also participated in responding to written discovery propounded to the Michigan Named Plaintiffs and defending their depositions, and was assigned to assist lead counsel with preparing the factual record and legal briefing submitted in connection with the cross-motions for summary judgment in the Michigan case.  Apart from the work assigned by lead counsel, the firm kept class representatives apprised of the status of the litigation, responded to class member inquiries, and attended the quarterly meetings of Plaintiffs' counsel.

The firm submitted a total of 1,255.90 hours, $493,150.00 in lodestar and contributed $55,000.00 to the litigation fund for shared expenses and $9,132 for firm expenses.  The firm was reimbursed $62,857 in December 2012 leaving a balance of $1,275.  Based on a complete review of the time and expense records, the audited lodestar is $482,250, which is 0.686% of the total audited lodestar of all firms.  This yields an allocation of $377,645.38 from the fees

awarded in the 19 settlements and $1,275.41 reimbursement of expenses.  Fagan McManus will not receive an origination fee from the settlements.

### DONALD LEWIS

Donald Lewis is one three counsel on the *Willis* complaint in the Pennsylvania action. The firm did not participate in any committees and was assigned no work by Co-Lead Counsel. It's allowed time pertained to the coordination and commencement of the case. The firm submitted a total of 52.80 hours, $26,664 in lodestar. The Donald Lewis firm did not contribute to the litigation fund for shared expenses and held $200 for firm expenses.  Based on a complete review of the time and expense records, the audited lodestar is $14,656.25 which is 0.021% of the total audited lodestar of all firms.  This yields an allocation of $11,477.17 from the fees awarded in the 19 settlements exclusive of origination and $200.70 of reimbursement of expenses.  Donald Lewis might receive a portion of the origination fee from the attorney's fees awarded in the Pennsylvania settlement depending upon the agreements between this firm and the other Pennsylvania counsel.

### FRISCHHERTZ POULLIARD FRISCHHERTZ & IMPASTATO, LLC

The Frischhertz firm was one of three firms that originated the Louisiana case.  The case was commenced and transferred into the MDL in 2007 during the class certification phase of the proceedings.  The Frischhertz firm assisted in preparing responses to the written discovery and document requests propounded to the two Louisiana Named Plaintiffs by FXG and in preparing for and defending their depositions.  The firm was also assigned to perform legal research and analysis of the Louisiana claims for use in the class certification and summary judgment filings. The Frischhertz firm was not assigned to any committees and was assigned no other work.  Its primary role was to keep class representatives apprised of the status of the litigation.  The firm

participated in the mediation and settlement, communicated settlement information to class members, and responded to class member inquiries.

The firm submitted a total of 543.41 hours, $218,947.31 in lodestar. The firm did not contribute toward the litigation fund for shared expenses and held $6,324 for firm expenses. Based on a complete review of the time and expense records, the audited lodestar for the firm is Co-Lead Counsel recommends an allocation of $177,234.56 which is 0.252% of the total audited lodestar for all firms. This yields an allocation of $138,790.70, plus $6,324.09 in expenses from the fees awarded in the 19 settlements, exclusive of origination. Frischhertz will also receive an origination fee from the attorney's fees awarded under the Louisiana settlement.

### LAW FIRM OF PHILIP STEPHEN FUOCO

The Fuoco firm was one of three firms that originated the *Willis* Pennsylvania action. In addition to the work involved in commencing the case, the Fuoco firm participated in the pleadings committee, researching statutory claims in the filed cases, and was assigned a document review project involving analysis of communications to drivers from FXG. The Fuoco firm was also assigned some briefing work in connection with the motions for class certification and summary adjudication. No additional work was assigned. Fuoco submitted time records for 160 hours of billed work, representing to the PSC that no additional time records exist.

Because Co-Lead Counsel are aware that the Fuoco firm performed certain assigned work for which no time records exist, the Co-Leads and the PSC allowed the time supported by contemporaneous billing records (160 hours), as well as an additional 145 hours for Mr. Fuoco for his work on the pleadings committee, discovery and class certification and summary judgment briefing, and 120 hours for his associate for his work on the summary judgment briefing. The Fuoco firm contributed $37,500 toward the litigation fund for shared expenses and held $644 for firm expenses.

The audited lodestar based upon these hours is $240,164.50, which is 0.342% of the total audited lodestar of all firms.  This yields an allocation of $188,070.53, plus reimbursement of expenses in the amount of $38,144.14 from the fees awarded in the 19 settlements, exclusive of origination.  Mr. Fuoco will receive an origination fee from the attorney's fees awarded under the Pennsylvania settlement.

## SALVATORE F. GANGEMI

Salvatore Gangemi is co-counsel in the New York action.  Mr. Gangemi investigated and commenced this case and assisted in the discovery responses and deposition preparation and defense of all five class Plaintiffs' depositions.  This firm participated in a discovery project involving photographing FXG terminals.  Otherwise, the firm's primary role was to keep class representatives apprised of the status of the litigation.  The Gangemi firm submitted a total of 420.07 hours, $202,655.70 in lodestar and did not contribute to the litigation fund for shared expenses.  Based on a complete review of the time and expense records, the audited lodestar is $201,635.70 which is 0.287% of the total audited lodestar of all firms.  This percentage yields an allocation of $157,899 from the fees awarded in the 19 settlements, exclusive of origination. There are no unreimbursed expenses. The Gangemi firm will receive some portion of the origination fee from the attorney's fees awarded under the New York settlement.

## LAW OFFICES OF GEORGE BARTON, P.C.

Law Offices of George A. Barton, P.C. commenced the Kansas (*Craig*) action.  The Barton firm was assigned to the deposition defense team and personnel from the firm prepared and defended 24 Named Plaintiff depositions, including the 10 Kansas class representatives as well as Plaintiffs in Alabama, Arkansas, Illinois, Indiana, and Mississippi.   Barton personnel also assisted in preparing responses to the written discovery and production requests propounded to the Kansas plaintiffs.  They were assigned to prepare the initial drafts of the Kansas class

certification brief and summary judgment briefing, as well as assigned document review and coding, deposition summaries, and a specific document review project analyzing "recruitment"-type documents produced by FXG.  The firm personnel played a limited role in researching the issues to present to the Seventh Circuit in the *Craig* appeal.   The firm's role subsequently involved keeping class representatives apprised of the status of the litigation.  Personnel from the firm attended the quarterly meetings of Plaintiffs' counsel.   The firm participated in the mediation of the *Craig* case and communicated with class members regarding the settlement.

The Barton firm submitted a total of 4,087.61 hours, $1,612,643 in lodestar.  Based on a complete review of the time and expense records, the audited lodestar is $971,032.50, which is 1.381% of the total audited lodestar of all firms.  Most of the time disallowed for the Barton firm was time spent on unsuccessful challenges to the leadership's authority and to time litigating the Missouri case <u>after</u> it was remanded to its home jurisdiction, which post-remand time is not compensable from the MDL litigation fund. The Barton firm's audited expenses total $144,866 including contribution of $77,500.00 to the litigation fund for shared expenses and $67,366 for firm expenses.

The *pro rata* percentage yields an allocation to the Barton firm of $760,406.30 of the fees awarded in the 19 settlements, exclusive of the origination fee, and reimbursement in the amount of $144,866.38 in expenses.   The firm will receive the origination fee from the attorney's fees awarded under the Kansas settlement.

### GILREATH AND ASSOCIATES

R. Christopher Gilreath of Gilreath and Associates is co-counsel in the Alabama and Tennessee actions.  In addition to investigating and commencing both of these cases, the Gilreath firm assisted in the preparation and defense of four Named Plaintiffs' depositions and assisted in preparing responses to the written discovery and production requests propounded to the Alabama

and Tennessee Plaintiffs.  The firm was not assigned additional work and its primary role, subsequent to the discovery phase of the case, was to keep class representatives apprised of the status of the litigation.  Personnel from the firm attended some quarterly meetings of Plaintiffs' counsel.  The Gilreath firm participated in mediations and settlements and communicated with class members regarding the settlement.   The firm submitted a total of 363.10 hours, $163,395.00 in lodestar.  The firm did not contribute to the litigation fund for shared expenses and held $1209 for firm expenses.  Based on a complete review of the time and expense records, the audited lodestar is $160,560, which is 0.228% of the total audited lodestar.  This yields an allocation of $125,733.01 of the fees awarded in the 19 settlements, exclusive of the origination fee, and $1,209.76 for reimbursed expenses.   The Gilreath firm will receive a portion of origination fees from the attorney's fees awarded under the Alabama and Tennessee settlements.

## GORBY PETERS LAW

Gorby Peters was local counsel in the Georgia case.  The firm prepared for and defended Plaintiff White's deposition and assisted in preparing responses to the written discovery and production requests propounded to Mr. White.  The firm met with and was retained by other Georgia drivers who became Named Plaintiffs in 2008.  The firm was assigned no other work by Co-Lead Counsel and its primary role was to keep class representatives apprised of the status of the litigation. A representative of the firm attended a quarterly meeting of Plaintiffs' counsel. The firm participated in the mediation and settlement of the case, and along with other Georgia counsel, communicated with Georgia drivers regarding the settlement.  The firm submitted a total of 942.50 hours, $341,830 in lodestar.  The firm did not contribute to the litigation fund for shared expenses and held $5,971 for firm expenses.  Based on a complete review of the time and expense records, the audited lodestar for Gorby Peters is $172,150.00 which is 0.245% of the total audited lodestar of all firms.   Based on this percentage, the Proposed Allocation is

$134,809.02 from the fees awarded in the 19 settlements, exclusive of the origination fee, and reimbursement of $5,971.25 in expenses.   The firm will also receive some portion of the origination fee from the attorney's fees awarded under the Georgia settlement.

## HALUNEN LAW

Halunen Law commenced nine cases that were transferred into the MDL proceeding. The Halunen firm was assigned work on several discovery projects, including accumulating and analyzing agency decisions regarding employment status, leading efforts on behalf of Plaintiffs to obtain information from the IRS regarding its investigations of FXG, and the review and coding of documents.   The firm assisted in preparing responses to the written discovery and production requests propounded upon the Named Plaintiffs in all of its cases; participated in the defense of several Plaintiffs' depositions; was assigned the work of taking affirmative depositions regarding the IRS tax audit.   The Halunen firm assisted with the Plaintiffs' website and responded to numerous driver inquiries.   Personnel from the firm attended the quarterly meetings of Plaintiffs' counsel.

The Halunen firm submitted a total of 2,016.00 hours, $1,301,185 in lodestar. The firm contributed $70,000.00 toward the litigation fund for shared expenses and held $12,989 for firm expenses.  Halunen Law was reimbursed for these expenses totaling $82,989 in December 2012. Based on a complete review of the time and expense records, the audited lodestar of the Halunen firm is $1,209,304.00 which is 1.720% of the total audited lodestar of all firms.  This percentage yields a distribution of $946,994.44 from the attorney's fees awarded in the 19 settlements exclusive of the origination fee.  Halunen Law will receive some portion of origination fees from the attorney's fees awarded in the Arizona, Georgia, Indiana, Minnesota, Tennessee and Wisconsin cases.

## LICHTEN & LISS RIORDAN, P.C.

Lichten & Liss Riordan (LLR) filed the Massachussetts, Vermont and Connecticut cases which were remanded in 2010.  LLR participated in the defense of the depositions of the New England Named Plaintiffs, assisted in responding to discovery propounded upon those Plaintiffs, and took a number of affirmative depositions of FXG and third party deponents.  LLR was assigned to the pleadings committee; document review projects pertaining to medical/health issues of drivers and Protective Insurance; and document review projects in connection with class certification and summary judgment.  The firm also participated in the state specific briefing in support of the class certification and summary judgment motions in the 42 cases.  Personnel from the firm attended several quarterly meetings of Plaintiffs' counsel.  The firm submitted a total of 2,784 hours, $1,809,600 in lodestar.  Based on a complete review of the time and expense records, Co-Lead Counsel recommends an allocation of $567,552 which is 0.807% of the total audited lodestar of all firms.  This yields an allocation of $444,444.95 of the fees awarded in the 19 settlements, exclusive of the origination fee, and reimbursement of $1,885.66 in expenses.  LLR will not receive an origination fee from these settlements.

## R. JAMES LORE

Jim Lore is one of the counsel on the complaint in the North Carolina action.  Mr. Lore participated in the preparation of and attended three of the Named Plaintiffs' depositions.  He was assigned no other work in the case.  Mr. Lore attended some of the quarterly meetings of Plaintiff's counsel.  His primary role was to keep North Carolina class representatives apprised of the status of the litigation.  He participated in the mediation and settlement of the case.  Mr. Lore submitted a total of 206.46 hours, $92,907.00 in lodestar.  The firm contributed $42,500.00 to the litigation fund for shared expenses and held $3,287 for firm expenses.  Lore was reimbursed for expenses in the amount of $42,500.00.  Based on a complete review of the time

and expense records, the audited lodestar for Mr. Lore is $83,322.00 which is 0.119% of the total audited lodestar of all firms.  That percentage yields and allocation of $65,248.66 from the fees awarded in the 19 settlements, exclusive of the origination fee, and $3,287.28 in unreimbursed expenses.   Mr. Lore will receive some portion of the origination fee from the attorney's fees awarded under the North Carolina settlement.

## MANI ELLIS & LAYNE P.L.L.C.

Mani Ellis commenced the West Virginia case.  Damon Ellis of the firm prepared and participated in the defense both of West Virginia Named Plaintiffs' depositions and assisted in preparing responses to the written discovery and production requests propounded on those Plaintiffs.  The firm was assigned no other work in the case and its primary role was to keep clients apprised of the status of the litigation.  Mr. Ellis participated in mediation.  The firm submitted a total of 39.90 hours, $11,970.00 in lodestar. The firm did not contribute to the litigation fund for shared expenses and held $1,816 for firm expenses.  Based on a complete review of the time and expense records, the audited lodestar is $11,970.00 which is 0.017% of the total audited lodestar of all firms.  This yields an allocation of $9,373.59 plus unreimbursed expenses in the amount of $1,816.50 from the fees awarded in the 19 settlements, exclusive of the origination fee.  Mani Ellis will receive the full origination fee from the attorney's fees awarded in the West Virginia case.

## MARKOWITZ & RICHMAN

Markowitz & Richman is one of the originating counsel in the *Willis* Pennsylvania action. Paula Markowitz attended Mr. Willis' deposition.  The firm was assigned no other work in the case.  The firm submitted a total of 170.70 hours, $118,263.00 in lodestar, that was supported by contemporaneous time records.  The firm contributed $20,500.00 to the litigation fund for shared expenses and held $1,267 for firm expenses.  Based on a complete review of the time and

expense records, the audited lodestar is $78,312.00, which is 0.111% of the total audited lodestar of all firms.  This yields an allocation of $61,325.38 of the fees awarded in the 19 settlements, exclusive of origination, and $21,767.92 for reimbursement of expenses.  Markowitz & Richman will receive some portion of the origination fee from the attorney's fees awarded under the Pennsylvania settlement.

### MARSHALL & FORMAN, LLC

Marshall & Forman was counsel on the complaint in the *Kelly* Ohio action.  The firm performed some work in connection with the motion for certification of the FLSA collective action in the *Givens* case.  The firm was assigned no additional work.  Marshall & Forman submitted a total of 78.30 hours, $23,235.00 in lodestar, and did not contribute to the litigation fund for shared expenses.  Based on a complete review of the time and expense records, the audited lodestar is $13,827.50, which is 0.020% of the total audited lodestar of all firms.  This percentage results in an allocation of $10,828.18 from the fees awarded in the 19 settlements, exclusive of the origination fee.  Marshall & Forman will receive some portion of the origination fee from the attorney's fees awarded under the Ohio settlement.

### O'MALLEY & LANGAN, P.C.

O'Malley & Langan was local counsel in the Ohio action.  The firm was assigned no work in the case.  The firm submitted a total of 125.37 hours, $62,984.00 in lodestar.  The firm did not contribute to the litigation fund for shared expenses and held $510 for firm expenses.  Based on a complete review of the time and expense records, the audited lodestar is $7,055.00 which is 0.010% of the total audited lodestar of all firms.  This yields an allocation of $5,524.70 from the fees awarded in the 19 settlements, and reimbursement of expenses in the amount of $510.03.  O'Malley will not receive an origination fee from the Ohio settlement.

### RICHARDSON PATRICK WESTBROOK & BRICKMAN LLC

Richardson Patrick was co-counsel with Carlson Lynch and together commenced the *Hart* Pennsylvania case.  Richardson Patrick was assigned no work in the case.  The firm submitted a total of 53.70 hours, $27,450.00 in lodestar and contributed $15,000.00 to the litigation fund for shared expenses.  Based on a complete review of the time and expense records, the audited lodestar of the Richardson Patrick firm is $18,350.00, which is 0.026% of the total audited lodestar of all firms.  This yields an allocation of $14,369.71 from the fees awarded in the 19 settlements and $15,000.00 for reimbursement of expenses.  Richardson Patrick will not receive an origination fee from the attorney's fees awarded in the Pennsylvania settlement.

### SMITH, PHILLIPS, MITCHELL, SCOTT & NOWAK, LLP

Smith Phillips commenced the Mississippi case, which was remanded in 2010.  Smith Phillips participated on the pleadings committee, researching legal theories in various states, and was assigned work drafting deposition summaries and reviewing and coding documents.  The firm participated in the preparation and defense of six Named Plaintiffs' depositions and assisted in preparing responses to the written discovery and production requests propounded by FXG. An associate working on the cases attended several quarterly meetings of Plaintiffs' counsel.  The firm submitted a total of 728.00 hours, $315,837.50 in lodestar.  The firm contributed $60,000.00 to the litigation fund for shared expenses and $8,642 for firm expenses.  The firm was reimbursed for these expenses totaling $68,642 in December 2012.  Based on a complete review of the time and expense records, the audited lodestar for Smith Phillips is $303,193.75, which is 0.431% of the total audited lodestar for all firms.  This results in an allocation of $237,428.14 from the fees awarded in the 19 settlements.   Smith Phillips will not receive an origination fee in these settlements.

## STAACK & SIMMS, P.A.

Staack & Simms commenced the remanded Florida case. The Staack firm participated in the pleadings committee, reviewing and researching statutory claims asserted in the various cases, and was assigned work reviewing and coding documents and summarizing deposition transcripts. Staack Simms participated in the preparation and defense of all of the Named Plaintiffs' depositions. Jim Staack regularly attended quarterly meetings of Plaintiffs' counsel. The firm submitted a total of 3,036.30 hours, $1,160,154.00 in lodestar. The firm contributed $67,500.00 to the litigation fund for shared expenses and $21,767 for firm expenses. Staack was reimbursed these expenses totaling $88,293 in December 2012. Based on a complete review of the time and expense records, the audited lodestar is $808,338.50 which is 1.150% of the total audited lodestar of all firms. This yields an allocation of $633,002.18 from the fees awarded in the 19 settlements and $390.84 reimbursement of expenses. The Staack firm will not receive an origination fee in these settlements.

## STOLL BERNE

Stoll Berne is the counsel in the remanded Oregon matter. The Stoll Berne firm was assigned to the deposition defense team and prepared and defended eleven Plaintiffs' depositions from different state cases; assisted in responding to discovery propounded upon Plaintiffs; and summarized deposition transcripts. The firm was assigned substantial briefing work in connection with the state briefing of class certification and summary judgment motions in the 42 cases. The firm submitted a total of 3,314.50 hours, $1,223,042.00 in lodestar. The firm contributed $77,500 to the litigation fund for shared expenses and $45,944 for firm expenses. These expenses totaling $123,444 were reimbursed in 2012. Based on a complete review of the time and expense records, the audited lodestar for Stoll Berne is $1,215,064.00 which is 1.729% of the total audited lodestar of all firms. This results in an allocation of $951,505.04 of the fees

awarded in the 19 settlements.  Stoll Berne will not receive an origination fee in these settlements.

## STRAUS & BOIES LLP

Straus & Boies is one of the counsel on the Maryland complaint.  In addition to research, investigation and claims analysis prior to commencing the case, the firm was assigned some research and briefing in connection with the summary judgment motions, and was assigned work investigating issues surrounding FXG's transition to an Independent Service Provider business model, which occurred during the litigation.  A representative of Straus Boies attended at least one quarterly meeting of Plaintiffs' counsel.  The firm otherwise kept class representatives apprised of the status of the litigation. The firm submitted a total of 699.50 hours, $301,042.00 in lodestar.  The firm contributed $57,500.00 to the litigation fund for shared expenses and 7,265 for firm expenses.  These expenses totaling $64,765 were reimbursed to the firm in 2012.  Based on a complete review of the time and expense records, the audited lodestar is $239,342.00 which is 0.341% of the total audited lodestar of all firms.  This results in an allocation in the amount of $187,426.44 from the fees awarded in the 19 settlements exclusive of the origination fee.   Straus & Boies has informed us that it is one of the originating counsel entitled to a portion of the origination fee from the attorney's fee awarded in the Maryland settlement.

## TAYLOR DUNHAM, LLP

Taylor Dunham filed an FLSA action in the *Humphreys* Texas case.  Following transfer, Co-Lead Counsel amended the complaint to remove the FLSA claims which were barred under the Federal Motor Carrier Act and assert state law claims consistent with the legal theories asserted in the other coordinated cases.  Taylor Dunham assisted in the preparation and defense of several depositions including the Named Plaintiffs in Texas, Alabama and Ohio, and deposed an FXG Operations Manager.  The firm assisted in drafting the class certification and summary

judgment briefs for the Texas case and was assigned document review and coding, participated in a declaration project for class certification, and a document review project in connection with the summary judgment motions. Representatives of the firm attended several quarterly meetings of Plaintiffs' counsel. Thereafter the primary role of the firm was to keep the named Plaintiffs' apprised of the litigation status. The firm submitted a total of 5,053.57 hours, $834,212.00 in lodestar. The firm contributed $72,500.00 to the litigation fund for shared expenses and $484.12 for firm expenses, which was reimbursed to the firm in 2012. Based on a complete review of the time and expense records, the audited lodestar for Taylor Dunham is $248,160.00, which is 0.353% of the total audited lodestar for all firms. The time disallowed was primarily time for the period prior to 2010 that was not included in the firm's time records submitted in 2012, but was contained in the firm's time records submitted in 2016 and, therefore, was not contemporaneously recorded. The time records also contained block billing entries of 25 hours per week for talking to clients; such block billing is not allowed pursuant to the billing guidelines provided to all counsel. The pro rata percentage yields an allocation of $194,331.73 from the fees awarded in the 19 settlements exclusive of the origination fee. Taylor Dunham will receive the entire origination fee from the attorney's fees awarded under the Texas settlement.

### THOMAS N. TREFETHERN

Thomas Trefethern is one of the counsel on the complaint in the Ohio action. The firm participated in the preparation and defense of six Named Plaintiffs' depositions and one FXG management deposition. The firm was assigned no additional work and its primary role was to keep the Named Plaintiffs' apprised of the status of the litigation. The firm submitted a total of 38.00 hours, $11,400.00 in lodestar and did not contribute toward the litigation fund for shared expenses. Based on a complete review of the time and expense records, the audited lodestar for the Trefethern firm is $2,250, which is 0.003% of the total audited lodestar of all firms. This

results in an allocation of $1,761.95 from the fees awarded in the 19 settlements exclusive of the origination fee.   The firm will receive some portion of the origination fee from the attorney's fees awarded under the Ohio settlement.

## WATTON LAW GROUP

Watton Law Group was one of several firms that commenced the Wisconsin case.  The firm was assigned significant discovery and document review work including:  the review and coding of documents produced by FXG; the review and analysis of the business discussion notes and the documents involving driver "terminations"; preparing summaries of deposition transcripts; document review and assembly for the omnibus fact memorandum in support of the summary judgment motions for all cases, and state specific factual appendices in support of summary judgment.  The firm also assisted in the preparation and defense of the Wisconsin Named Plaintiffs' depositions, and attended all quarterly meetings of Plaintiffs' counsel.  The firm participated in the mediation and settlement of the Wisconsin case.

Watton Law Group submitted a total of 9,720 hours, $3,479,009 in lodestar.  The firm contributed $72,500 toward the litigation fund for shared expenses and $41,649.72 for firm expenses.  Expenses totaling $111,277 were reimbursed to the Watton firm in December 2012, leaving a balance of $2,872.  Based on a complete review of the time and expense records, the audited lodestar for the Watton Law Group is $2,974,993, which is 4.232% of the total audited lodestar of all firms.  This yields an allocation of $2,329,688.67 of the attorney's fees awarded in the 19 settlements, exclusive of the origination fee, and $2,872.46 in reimbursement of expenses. The Watton Law Group will receive some portion of the origination fee from the attorney's fees awarded in the Wisconsin settlement.

## WHETSTONE PERKINS & FULDA, LLC

Whetstone Perkins is co-counsel in the North Carolina, South Carolina and Georgia cases. The firm participated in the preparation and defense of five Named Plaintiffs' depositions. The firm was assigned no additional work by Co-Lead Counsel, served on no committees, and its primary role was to keep the class representatives apprised of the status of the litigation. Personnel from the firm attended the quarterly meetings of Plaintiffs' counsel and participated in the mediations in the three cases. The firm submitted a total of 1,175 hours, $467,621 in lodestar and did not contribute to the litigation fund for shared expenses. The firm was reimbursed $11,217 for held expenses in December 2012. Based on a complete review of the time and expense records, the audited lodestar for Whetstone Perkins is $439,931, which is 0.626% of the total audited lodestar for all firms. This yields an allocation of $344,505.77 from the fees awarded in the 19 settlements, exclusive of the origination fees to be received. Whetstone Perkins will receive a portion of the origination fee from the attorney's fees awarded in the North Carolina, South Carolina, and Georgia settlements.

## WINEBRAKE & SANTILLO, LLC

Winebrake & Santillo is one of the counsel who commenced the Ohio case. In addition to researching and investigating the Ohio claims, the firm assisted in taking a 30(b)(6) deposition relating to certain defenses asserted by FXG. The Winebrake firm performed work on the *Givens* and *Vargas* cases in an effort to obtain certification of classes of small truck delivery drivers, and attended the quarterly meetings of Plaintiffs' counsel. The remainder of the time incurred in the case was primarily to keep class representatives apprised of the status of the litigation. The firm participated in the mediation and settlement of the case. The Winebrake firm submitted a total of 630.10 hours, $331,207.50 in lodestar. Based on a complete review of the time and expense records, the audited lodestar for the Winebrake firm is $290,377.50, which

represents 0.413% of the total audited lodestar of all firms.  This results in an allocation in the amount of $227,391.85 from the fees awarded in the 19 settlements, exclusive of the origination fee.  Winebrake & Santillo will receive a portion of the origination fee from the attorney's fees awarded under the Ohio settlement.

## LAW OFFICES OF PETER N. WASYLYK

Peter Wasylyk was one of the originating counsel in the Maryland and Rhode Island cases and has informed us that he was an originating counsel in the remanded Oregon case along with Stoll Berne and Siegel Brill.  The firm submitted no time and was assigned no work in the case.  The Wasylyk firm will receive a portion of the origination fee from the attorney's fees awarded under the Maryland and Rhode Island settlements.

## VI.    CONCLUSION

The allocation formula comports with the expectations of all counsel as to how they would be compensated and with fee allocation principles accepted by numerous courts in class action MDL proceedings.  Because the Proposed Allocation is entirely supported by the record, is transparent, provides due process to all counsel, and above all is fair and reasonable, the Co-Lead Counsel and the PSC ask this Court to approve it.

Dated: July 11, 2017      Respectfully submitted,

              LOCKRIDGE GRINDAL NAUEN P.L.L.P.


              s/Susan E. Ellingstad
              Susan E. Ellingstad
              100 Washington Avenue South, Suite 2200
              Minneapolis, MN 55401
              Tel: (612) 339-6900
              Fax: (612) 339-0981
              seellingstad@locklaw.com

| | |
|---|---|
| Beth A. Ross | Robert I. Harwood |
| LEONARD CARDER, LLP | Matthew M. Houston |
| 1330 Broadway, Suite 1450 | HARWOOD FEFFER LLP |
| Oakland, CA 94612 | 488 Madison Avenue, 8th Floor |
| Tel: (510) 272-0169 | New York, NY 10022 |
| Fax: (510) 272-0174 | Tel: (212) 935-7400 |
| bross@leonardcarder.com | Fax: (212) 753-3630 |
| | rharwood@hfesq.com |
| | mhouston@hfesq.com |

*Plaintiffs' Co-Lead Counsel*

| | |
|---|---|
| Wm. Christopher Penwell | Anthony L. Marchetti, Jr. |
| Brian E. Weisberg | MARCHETTI LAW, P.C. |
| SIEGEL BRILL, P.A. | 900 N. Kings Highway, Suite 306 |
| 100 Washington Avenue South, Suite 1300 | Cherry Hill, NJ 08034 |
| Minneapolis, MN 55401 | Tel: (856) 414-1800 |
| Tel: (612) 337-6100 | Fax: (267) 219-4838 |
| Fax: (612) 339-6591 | AMarchetti@MarchettiLawFirm.com |
| ChrisPenwell@siegelbrill.com | |
| BrianWeisberg@siegelbrill.com | |

J. Gordon Rudd
ZIMMERMAN REED, P.L.L.P.
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 341-0400
Fax: (612) 341-0844
jgr@zimmreed.com

*Plaintiffs' Steering Committee*